1
2
3
4
5                    UNITED STATES DISTRICT COURT
6                    EASTERN DISTRICT OF WASHINGTON
7
8    LARRY I. NEWKIRK and RUTH A.
     NEWKIRK,
9                                          NO:  CV-08-273-RMP
                          Plaintiffs,
10
11          v.
12                                         MEMORANDUM OPINION AND
     CONAGRA FOODS, INC., a                ORDER
13   Delaware corporation, et al.,
14                         Defendants.
15
16
17
18                        **I. INTRODUCTION**
19          On June 7, 2010, the Court held a hearing on Defendants' five *Daubert*[1] and
20   two summary judgment motions.[2]  After hearing oral argument and reviewing all
21   _____
22   [1] *Daubert v. Merrell Dow Pharm. Inc.,* 509 U.S. 579 (1993).
23   [2] Defendants' Joint Motion to Exclude the Supplemental Opinion of Dr. Egilman
24   (Ct. Rec. 359), Defendants' Joint Motion to Exclude the General Causation
25   Testimony of Plaintiffs' Experts (Ct. Rec. 228), Defendants' Joint Motion to
26   Exclude the Specific Causation Testimony of Plaintiffs' Expert Dr. Egilman
27
28   MEMORANDUM OPINION AND ORDER ~ 1

of the memoranda and exhibits that are listed in Addendum A, as well as the rest of the file and pleadings in this case, the Court issued a text order on June 24, 2010, granting Defendants' *Daubert* and summary judgment motions for the reasons set out in this memorandum opinion.

As a preliminary matter, the Court granted the parties opportunities to file overlength briefing (Ct. Recs. 220, 261, 270, and 303) and additional time to file their responses and replies (Ct. Recs. 270 and 300). On May 19, 2010, less than three weeks before the oral argument hearing on the five *Daubert* motions and two summary judgment motions, the Plaintiffs notified the Court and the Defendants of their intention to present the live testimony of Dr. Egilman at the hearing (Ct. Rec. 456). The Defendants objected to the Plaintiffs' intentions and moved to preclude Dr. Egilman's live testimony as untimely and prejudicial (Ct. Rec. 470). The

_____

(Ct. Rec. 231), Defendants' Joint Motion to Exclude the Specific Causation Testimony of Plaintiffs' Expert Dr. Pue (Ct. Rec. 234), Defendants' Joint Motion to Exclude the Testimony of Dr. Parmet (Ct. Rec. 237), Defendants' Joint Motion to exclude the Testimony of Plaintiffs' Expert William Ewing (Ct. Rec. 240), and Defendants' Joint Motion for Summary Judgment Dismissal of Plaintiffs' Claims (Ct. Rec. 243), and Defendant Chr. Hansen, Inc.'s Motion for Summary Judgment (Ct. Rec. 252).

MEMORANDUM OPINION AND ORDER ~ 2

Court concluded that there was a sufficient evidentiary record[3] on which to hear

argument and granted Defendants' motion to preclude live testimony.  *See*

*Millenkamp v. Davisco Foods Intern., Inc.*, 562 F.3d 971, 979 (9th Cir. 2009);

*Oddi v. Ford Motor Co.*, 234 F.3d 136, 154 (3d Cir.2000).

The central issue of all of these motions is whether Plaintiffs' experts should

be allowed to testify as to general causation and specific causation in this case.

## II.  BACKGROUND

Larry Newkirk and Ruth Newkirk alleged in their original complaint claims

for negligence, strict liability in tort—design defect, failure to warn, violation of

Washington Consumer Protection Act, and loss of consortium and medical

expenses (Ct. Rec. 1) (filed Sept. 1, 2008).  The Newkirks later stipulated to

dismissal of the Washington Consumer Protection Act claim (Ct. Rec. 45).  On

---

[3] The parties filed multiple statements of Dr. David Egilman's opinions in the

forms of his Rule 26 Expert Report from September 15, 2009 (Ct. Rec. 248-2); Dr.

Egilman's April 19, 2010, Affidavit (Ct. Rec. 323); Dr. Egilman's April 26, 2010,

Supplemental Affidavit (Ct. Rec. 325); a set of Power Point slides prepared by Dr.

Egilman and produced at his January 26, 2010, deposition (Ct. Rec. 361-1); and

extensive excerpts from Dr. Egilman depositions (Ct. Rec. 248-19; Ct. Rec. 394-2),

and voluminous memoranda and exhibits filed in support and opposition to the five

*Daubert* motions and the two summary judgment motions.

MEMORANDUM OPINION AND ORDER ~ 3

November 5, 2008, the Newkirks filed a First Amended Complaint (Ct. Rec. 62) to substitute Chr. Hansen, Inc. ("Hansen") as a named party for a John Doe defendant. The Newkirks realleged the negligence, strict liability in tort—design defect, failure to warn, and loss of consortium claims in the First Amended Complaint (Ct. Rec. 62).

Among the Newkirks' factual allegations is that Mr. Newkirk's "exposure to Defendants' popcorn and natural and artificial butter flavorings directly and proximately caused . . . bronchiolitis obliterans, severe and progressive damage to the respiratory system, extreme shortness of breath and reduced life expectancy" (Ct. Rec. 62 at 8). ConAgra Foods, Inc. ("ConAgra") manufactured the Act II Butter and Act II Butter Lovers popcorn that Mr. Newkirk primarily consumed (Ct. Rec. 62 at 4, 6, 8). Defendants Symrise, Inc. ("Symrise") and Hansen supplied butter flavorings to ConAgra during the time period relevant to Mr. Newkirk's claims (Ct. Rec. 62 at 6).

### *Mr. Newkirk's Consumption of Microwave Popcorn*

Mr. Newkirk alleges in the First Amended Complaint that he "regularly prepared four to six bags of microwave popcorn" sold under labels manufactured by ConAgra "[b]eginning in or around 1989 and continuing into September 2007" (Ct. Rec. 62 at 8). The Newkirks revise their allegation regarding the extent of Mr. Newkirk's popcorn consumption in their Counter Statement of Material Facts in

MEMORANDUM OPINION AND ORDER ~ 4

Support of Plaintiffs' Opposition to Defendants' Joint Motion for Summary

Judgment and Daubert Motions (Ct. Rec. 321) and state that Mr. Newkirk "ate

between five to seven bags of microwave popcorn each day for approximately 11

years and was eating microwave popcorn before he reached this level of daily

exposure" (Ct. Rec. 32 at 10).

Mr. Newkirk began eating popcorn regularly in the late 1980s or early

1990s, around the time he quit smoking, to suppress his appetite and avoid gaining

weight.  Newkirk Dep., Sept. 2, 2009 (Ct. Rec. 249-20 at 819); Charles A. Pue,

MD, Expert Report, Aug. 7, 2009 (Ct. Rec. 248-3 at 81).  Mr. Newkirk had been a

smoker for approximately seven years and quit smoking in approximately 1987.

Michael P. Williams, MD, FACC, Consultation Report, Jul. 3, 2003 (Ct. Rec. 249-

19 at 808).  When Mr. Newkirk popped popcorn at home, he did not routinely

stand in front of the microwave.  Newkirk Dep., Sept. 2, 2009 (Ct. Rec. 249-20 at

821).  Instead, while the popcorn was popping, he left the area of the microwave to

do something else and then returned and removed the bag a few seconds after the

microwave completed its heating cycle.  Newkirk Dep., Sept. 2, 2009 (Ct. Rec. 327

at 1057).  He normally left the kitchen to eat the popcorn either in the living room

or in the car on the way to work.  Newkirk Dep., Sept. 2, 2009 (Ct. Rec. 249-20 at

821, 833; Ct. Rec. 327 at 1057).  He opened the bag away from his face, at chest

level.  Newkirk Dep., Sept. 2, 2009 (Ct. Rec. 249-20 at 821).

MEMORANDUM OPINION AND ORDER ~ 5

### *Bronchiolitis Obliterans and Related Diseases*

Bronchiolitis obliterans (sometimes referred to by the parties or their witnesses as "BO") is a relatively uncommon, severe lung disease characterized by two main physiological effects: (1) obstruction to airflow; and (2) air trapping/hyperinflation. Philip Harber, Kaochoi Saechao, and Catherine Boomus, Diacetyl-Induced Lung Disease, 25(4) Toxicol. Rev. 261, 263-64 (2006) (Ct. Rec 327-6). A conclusive diagnosis of bronchiolitis obliterans may be made only through a lung biopsy. *See, e.g.,* Allen Parmet, MD, MPH, Dep., Dec. 16, 2009 (Ct. Rec. 248-8 at 192). However, a lung biopsy is an invasive procedure with substantial health risks (Ct. Rec. 248-16 at 289). Moreover, a biopsy may not offer a definitive diagnosis in all cases. Kathleen Kreiss & Ann Hubbs, *Letter to the Editor RE: Galbraith D and Weill D (2009) Popcorn lung and bronchiolitis obliterans: a critical appraisal 82:407-416*, 83 Int. Arch. Occup. Environ Health 467 (2010) (Ct. Rec. 327-21 at 224). For some patients who are unresponsive to drug therapies, a pathologic diagnosis does not change the recommended course of treatment. *Id.* (Ct. Rec. 327-21 at 224). Bronchiolitis obliterans primarily arises in the post-infection context, such as after a lung transplant or pneumonia. Richard Kanwal, et al., *NIOSH Health Hazard Evaluation Report, HETA # 2000-0401-2991, Gilster-Mary Lee Corporation, Jasper Missouri* (January 2006) (Ct. Rec. 248-18 at 316). Bronchiolitis obliterans syndrome is a collection of symptoms and

MEMORANDUM OPINION AND ORDER ~ 6

clinical observations of obstructive pulmonary disease that, together, are consistent with bronchiolitis obliterans.  Kendall Wallace, PhD, Expert Report, Nov. 4, 2009 (Ct. Rec. 250-3 at 965).

### *Diagnosis of Mr. Newkirk's Illness*

Mr. Newkirk began noticing shortness of breath, chest tightness, dry cough, and fatigue during his regular activities sometime between 2000 and 2003.  Sanjay Agarwal, MD, Letter (Ct. Rec. 249-9 at 773-74); Parmet Expert Report, Aug. 26, 2008 (Ct. Rec. 248-4 at 92).  After reading an article in 2007 about a popcorn consumer developing "popcorn lung," Mr. Newkirk went to his family doctor to see whether he, too, might have a disease related to inhalation of butter flavoring fumes.  Newkirk Dep., Sept. 2, 2009 (Ct. Rec. 249-20 at 819); Newkirk Dep., Sept. 3, 2009 (Ct. Rec. 334-1 at 1052).  Mr. Newkirk was referred to Dr. Sanjay Agarwal, a pulmonologist then practicing in Spokane, who diagnosed him with "obstructive lung disease given his significant history of smoking[.]"  Agarwal Letter (Ct. Rec. 249-9 at 775-76).

Mr. Newkirk then saw Plaintiffs' expert Dr. Allen Parmet in Missouri, who diagnosed Mr. Newkirk with "[b]ronchiolitis obliterans syndrome/flavoring induced bronchiolitis obliterans (FIBO)[.]"  Parmet Expert Report, Aug. 26, 2008 (Ct. Rec. 248-4 at 100).  Mr. Newkirk also saw Plaintiffs' expert Dr. Charles Pue in Ohio, who determined that Mr. Newkirk's "[c]linical picture is consistent with

MEMORANDUM OPINION AND ORDER ~ 7

bronchiolitis obliterans syndrome from butter flavoring (diacetyl)." Charles Pue, MD, Expert Report (Ct. Rec. 248-3). Mr. Newkirk also was evaluated by Plaintiffs' expert Dr. David Egilman in Massachussetts, who originally diagnosed Mr. Newkirk with bronchiolitis obliterans. David Egilman, MD, MPH, Sept. 15, 2009, Expert Report (Ct. Rec. 248-2 at 52). Other physicians who examined Mr. Newkirk did not diagnose him with bronchiolitis obliterans. *See* James Elmer, MD, Consultation Report (Ct. Rec. 249-10, Consultation Report of Dr. James Elmer); Gregory Doering, MD, Progress Notes (Ct. Rec. 249-11); Timothy Bruya, MD, Expert Report for Defendants (Ct. Rec. 250-7 at 1123); David Weill, MD, Expert Report for Defendants (Ct. Rec. 250-5 at 1062-63); Mark Utell, MD, Expert Report for Defendants (Ct. Rec. 249-23 at 896). However, it is undisputed that Mr. Newkirk has not had a lung biopsy, and, therefore, has not received a conclusive diagnosis of bronchiolitis obliterans.

The connection between obstructive lung disease and microwave popcorn containing butter flavorings became a matter of concern for popcorn manufacturers and their employees in 2000 and 2001. The culprit compound was identified as diacetyl, a flavoring agent used to provide a buttery taste and a sense of "creaminess." Philip Harber, Kaochoi Saechao, and Catherine Boomus, *Diacetyl-Induced Lung Disease*, 25(4) Toxicol. Rev. 261, 263-64 (2006) (Ct. Rec 327-6, Exh. F). The typical microwave popcorn plant has a slurry mixing area where the

MEMORANDUM OPINION AND ORDER ~ 8

components of butter flavoring are mixed into a solution and that solution is mixed into vats with heated oil and salt.  The plant also has a quality assurance or quality control area, a manufacturing area, a packaging area, a warehouse, a printing press, bag assembly area, and offices.  *See* Richard Kanwal et al., *Evaluation of Flavorings-Related Lung Disease Risk at Six Microwave Popcorn Plants*, 48 Journal of Occupational and Environmental Medicine 149 (February 2006) (Ct. Rec. 248-20); Richard Kanwal and Greg Kullman, *NIOSH Health Hazard Evaluation Report, HETA # 2004-0112-2949, ConAgra Snack Foods, Marion, Ohio* (December 2004) (Ct. Rec. 249).

Quality assurance workers pop dozens of bags of popcorn per work shift.[4] For instance, at the ConAgra plant in Marion, Ohio, each worker popped up to 130 bags per 12-hour workshift.  Richard Kanwal and Greg Kullman, *NIOSH Health Hazard Evaluation Report, HETA # 2004-0112-2949, ConAgra Snack Foods, Marion, Ohio* (December 2004) (Ct. Rec. 249 at 573).  In Plant F in the Kanwal, et al., report, quality assurance workers popped 130 bags of popcorn in a 12-hour

---

[4] Some plant workers work in quality assurance full-time.  *See* Richard Kanwal et al., *Evaluation of Flavorings-Related Lung Disease Risk at Six Microwave Popcorn Plants*, 48 Journal of Occupational and Environmental Medicine 149 (February 2006) (Ct. Rec. 248-20).  Other plants have workers who perform quality assurance work on certain days each week or month.  *Id*.

MEMORANDUM OPINION AND ORDER ~ 9

workshift, but performed that task only 3-4 days per week for 1 out of every 3 weeks.  Richard Kanwal et al., *Evaluation of Flavorings-Related Lung Disease Risk at Six Microwave Popcorn Plants*, 48 Journal of Occupational and Environmental Medicine 149, 156 (February 2006) (Ct. Rec. 248-20 at 505).  In Plant D, workers popped 75 bags per 8-hour work shift.  *Id.*

Research on safe levels of occupational and consumer exposures to diacetyl has been limited because manufacturers of microwave popcorn, including ConAgra, stopped using diacetyl in or around 2007.  Kenneth L. White, et al., 7 J. of Occupational and Environmental Hygiene 185, 185 (April 2010) (Ct. Rec. 477-18 at 206).  The scientific community has yet to determine a safe level of diacetyl exposure.  *See*, *e.g.*, (Ct. Rec. 248-8 at 157-61); (Ct. Rec. 248-20 at 505).

### III. ANALYSIS

**A.  *Daubert* Motions to Exclude Plaintiffs' Expert Witness Testimony**

**1.  Dr. David Egilman's Supplemental Affidavits**

As a preliminary matter, Defendants filed a Joint Motion to Exclude the Supplemental Opinions of Dr. David Egilman (Ct. Rec. 359).  Defendants rely on the expert opinion disclosure requirements established in Fed. R. Civ. P. 26, as well as this Court's prior scheduling orders, as the bases to exclude Dr. Egilman's supplemental opinions.

MEMORANDUM OPINION AND ORDER ~ 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

This case was filed in 2008 (Ct. Rec. 360 at 1).  The Court's scheduling

orders established a Plaintiffs' expert witness disclosure deadline of no later than

September 1, 2009, and a discovery cut-off deadline of April 9, 2010.  Defendants

agreed to extend Plaintiffs' expert witness disclosure deadline to September 15,

2009 (Ct. Rec. at 2).

Defendants argue that Dr. Egilman significantly altered some of his opinions

between his September 15, 2009, expert opinion report, and his January 26, 2010,

deposition, such as altering his diagnosis of Mr. Newkirk from "bronchiolitis

obliterans" to "bronchiolitis obliterans syndrome," which Defendants argue is

substantially different (Ct. Rec. 360 at 5-6).  In addition, Defendants contend that

Dr. Egilman's 85-page affidavit, dated April 19, 2010, which Defendants also

move to exclude as untimely, contains calculations not previously disclosed and

opinions significantly varied from his September 15, 2009, report (Ct. Rec. 360 at

6).

Plaintiffs argue that Dr. Egilman's affidavit of April 26, 2010, is a

supplemental report that augments and corrects his previous expert opinion report,

as required by Fed. R. Civ. P. 26(e)(2) (Ct. Rec. 476 at 6-7).   In addition, they

argue that Bronchiolitis Obliterans Syndrome is not significantly different from

Bronchiolitis Obliterans (Ct. Rec. 476 at 5).  Plaintiffs contend that they would

MEMORANDUM OPINION AND ORDER ~ 11

have been in violation of Fed. R. Civ. P 26 if they had not provided the supplemental affidavit (Ct. Rec. 476 at 7).

Pursuant to Federal Rule of Civil Procedure 26 a party must provide a timely report that includes "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(A), (B). Failure to abide by the disclosure requirements in Fed. R. Civ. P. 26 can result in sanctions pursuant to Fed. R. Civ. P. 37.

In this case, the Court concludes that although Dr. Egilman's supplemental opinions do significantly augment and correct his previous opinions disclosed in his September 15, 2009, report, Defendants have not suffered prejudice as a result. Therefore, the Court denies Defendants' Motion to Exclude Supplemental Opinions of Dr. David Egilman, Ct. Rec. 359.

## 2. Legal Standards

### *Plaintiffs' Burden for Proving Causation*

Plaintiffs in toxic tort cases must establish both general and specific causation. *Golden v. CH2M Hill Hanford Group, Inc.*, 528 F.3d 681, 683 (9th Cir.2008). Evidence supporting general or generic causation addresses "whether the substance at issue had the capacity to cause the harm alleged." *In re Hanford Nuclear Reservation Litigation*, 292 F.3d 1124, 1133 (9th Cir.2002). Specific causation, by contrast, concerns "whether a particular individual suffers from a

MEMORANDUM OPINION AND ORDER ~ 12

particular ailment as a result of exposure to the substance." *In re Hanford*, 292 F.3d at 1133. The specific causation issue is "highly individualistic" and depends upon the characteristics of an individual plaintiff, such as his or her overall health, lifestyle, and the nature of the exposure to the substance at issue. *In re Hanford*, 292 F.3d at 1133 (*quoting In re Agent Orange Product Liability Litigation MDL No. 381*, 818 F.2d 145, 165 (2d Cir.1987)).

### ***Daubert Legal Standard***

The Federal Rules of Evidence allow testimony by a qualified expert who will assist a trier of fact in understanding the evidence or in determining a fact in issue, so long as "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

It is the trial judge's responsibility to act as a "gatekeeper" by ensuring "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (*Daubert I*). In making this determination, the judge must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert I*, 509 U.S. at

MEMORANDUM OPINION AND ORDER ~ 13

592-93.  The Court's gatekeeping function exists to ensure that an expert witness "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co.*, 526 U.S. at 152.

Many factors bear on the inquiry into the reliability of expert testimony, including the following considerations: (a) whether the theory or technique can and has been tested; (b) whether the theory or technique has been subjected to peer review and publication; (c) whether the known or potential rate of error for the technique has been addressed; and (d) whether the theory or technique has a general degree of acceptance in the relevant scientific community.  *Daubert I*,  509 U.S. at 593-94.

A trial court "may consider one or more of the specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability.  But, as the Court stated in *Daubert*, the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case."  *Kumho Tire Co.*, 526 U.S. at 141.  An expert's testimony, at a minimum, must rest on "good grounds, based on what is known."  *Daubert I*, 509 U.S. at 590.

For a scientific opinion to have evidentiary relevance and reliability under Fed. R. Evid. 702, the opinion must be based on scientifically valid principles and the testimony must assist the trier of fact to determine a fact at issue in the case.  *Daubert I*, 509 U.S. at 589.  Relevant expert testimony "logically advances a

MEMORANDUM OPINION AND ORDER ~ 14

material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) (*Daubert II*).  An expert's testimony must assist the trier of fact and relate to, or "fit," the underlying facts of the case. *Daubert II*, 43 F.3d. at 1320.  This requirement of "fit" or "helpfulness" demands "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert II*, 43 F.3d at 1317-18 (quoting *Daubert I*, 509 U.S. at 592); *see also* Fed. R. Evid. 702.

The party proffering the expert testimony bears the burden of demonstrating that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable.  The court is to conduct a "holistic" analysis of the expert's testimony.  *See United States v. W.R. Grace*, 504 F.3d 745, 762 (9th Cir. 2007). The court should review the expert's opinion testimony for "overall sufficiency of the underlying facts and data, and the reliability of the methods, as well as the fit of the methods to the facts of the case." *W.R. Grace*, 504 F.3d at 765.  When there is too great an analytical gap between the data and the opinion proffered, the trial court may properly exclude the testimony as unreliable.  *Joiner*, 522 U.S. at 146.

*/ / /*

*/ / /*

MEMORANDUM OPINION AND ORDER ~ 15

### 3. Motion to Exclude Expert Testimony on General Causation and Motion to Exclude Specific Causation Testimony of Dr. Egilman

Defendants assert, and Plaintiffs do not dispute, that Dr. Egilman's expert opinion testimony is the Plaintiffs' primary evidence supporting general causation. Defendant's Memorandum (Ct. Rec. 229 at 3); Plaintiffs' Opposition (Ct. Rec. 320).

Defendants do not contest Dr. Egilman's qualifications as an expert. Dr. Egilman received a bachelor of science degree in Molecular Biology at Brown University in 1974, a medical degree from Brown University Medical School in 1978, and a masters degree in public health from the Harvard School of Public Health in 1982. Curriculum Vitae (Ct. Rec. 331-11 at 885). He is licensed to practice medicine in three states and is board certified in Occupational and Internal Medicine. Curriculum Vitae (Ct. Rec. 331-11 at 885). Dr. Egilman is a very accomplished scientist who has served as an expert witness in other cases involving microwave popcorn workers and is being proffered as an expert witness in at least one other microwave popcorn consumer case. Excerpt of Dr. Egilman's Trial Testimony on May 20, 2009, in *Aldrich v. International Flavors & Fragrances, et al.*, Case No. A-0700451, Court of Common Pleas, Hamilton

MEMORANDUM OPINION AND ORDER ~ 16

County, Ohio (Ct. Rec. 509-20);  Dr. Egilman Dep., April 27, 2010, In the Matter of: *Elaine Khoury, et al. v. Conagra Foods, Inc. et al.* (Ct. Rec. 394-2) and (Ct. Rec. 509-18).

Plaintiffs retained Dr. Egilman to offer an opinion on general causation as well as to examine Mr. Newkirk, diagnose him, and offer an opinion regarding the specific cause of his condition.  The Defendants contend that all of the Newkirks' other causation expert witnesses, Dr. Charles Pue, Dr. Allan Parmet, and William Ewing, assume that general causation already has been established.   Memorandum of Defendants (Ct Rec. 229) (citing Pue Expert Report, Parmet Expert Report, Parmet Supp. Expert Report, Ewing Expert Report, Ewing Supp. Expert Report). The Defendants maintain that Dr. Egilman fails to apply proper scientific methodology and that the methodology and reasoning he does apply cannot be properly applied to Mr. Newkirk's claims to support general causation.

The Plaintiffs respond that general causation "as to exposure to butter flavoring" is well established and that Dr. Egilman provides reliable and relevant opinions based on differential diagnosis as well as on his assessment of Mr. Newkirk's exposure levels compared to levels known to cause disease.

General causation in this case demands evidence that the substance to which Mr. Newkirk was exposed by popping microwave popcorn was capable of causing the bronchiolitis obliterans and respiratory ailments that the Newkirks' assert Mr.

MEMORANDUM OPINION AND ORDER ~ 17

Newkirk now suffers.  Specific causation requires evidence that Mr. Newkirk

suffers from bronchiolitis obliterans or other respiratory ailments and that those

ailments developed as a result of Mr. Newkirk's exposures to vapors emitted from

microwave popcorn.

As to general causation, Dr. Egilman forwards the following opinions:

"There is no known safe level of diacetyl exposure.  [Existing scientific] studies

also suggest that levels of diacetyl exposure below and around 1 ppm can cause

BO and other respiratory illnesses."  Dr. Egilman Expert Report, Sept. 15, 2009

(Ct. Rec. 248-2 at 25).  Dr. Egilman proceeds from that basis to state his opinion

on specific causation:

> Mr. Newkirk's BO is consistent with epidemiological evidence linking
> exposure of butter popcorn flavoring containing diacetyl to
> bronchiolitis obliterans. . . . Mr. Newkirk's symptoms first appeared in
> the early 1990s after years of popping and eating butter-flavored
> microwavable popcorn. His symptoms are comparable both with other
> known consumer cases of lung disease from in-home butter flavoring
> exposures as well as industrial cases of BO and related lung disease in
> workers exposed in butter flavoring and popcorn production plants.

Dr. Egilman Expert Report, Sept. 15, 2009 (Ct. Rec. 248-2 at 26).

Dr. Egilman also states his opinions more succinctly elsewhere: "Mr.

Newkirk, within a reasonable degree of medical certainty developed lung

disease as a result of inhaling flavors released by microwaved popcorn."  Dr.

Egilman Expert Report, Sept. 15, 2009 (Ct. Rec. 248-2 at 25).

MEMORANDUM OPINION AND ORDER ~ 18

The Court's inquiry is whether Dr. Egilman's opinions are (1) based on sufficient facts or data and (2) the product of reliable principles and methods and (3) whether Dr. Egilman has reliably applied those principles and methodology to the facts of this case. Fed. R. Evid. 702. After conducting a holistic analysis of those factors, the Court examines whether Dr. Egilman's opinions would assist a trier of fact to determine a material question at issue in this case.

In Dr. Egilman's Rule 26 expert disclosure report dated September 15, 2009, Dr. Egilman articulated three bases on which he relied to determine Mr. Newkirk's exposure level: (1) a purported study of Wayne Watson's home by John Martyny, an industrial hygienist working for the National Jewish and Medical Research Center with Dr. Rose; (2) a United States Environmental Protection Agency (EPA) study (a.k.a. the "Rosati Study") conducted in 2007; and (3) an initial expert report of William Ewing (Ct. Rec. 248-2). In supplemental affidavits, Dr. Egilman offers additional opinions regarding the relationship of diacetyl's alleged injurious effects in microwave popcorn and in the slurry used in microwave popcorn production. *See* Dr. Egilman Aff., Apr. 19, 2010 (Ct. Rec. 323); Dr. Egilman Supp. Aff., Apr. 26, 2010 (Ct. Rec. 325). He also offers numerous other bases for and methodologies supporting his opinions, and in some instances offers no basis or methodology to support his opinions, all discussed below.

MEMORANDUM OPINION AND ORDER ~ 19

### ***Whether Dr. Egilman's opinions are based on sufficient facts or data***

The first step of the inquiry is determining whether Dr. Egilman based his opinions on sufficient facts or data. Where there is no indication of the reasoning and methods underlying an expert witness's conclusion, the Court cannot make the necessary findings of reliability and utility to a fact-finder under Fed. R. Evid. 702. Therefore, those conclusions are properly excluded. *Claar v. Burlington Northern R. Co.*, 29 F.3d 499, 502 (9th Cir.1994).

To analyze the sufficiency of the underlying facts or data, the Court examines Dr. Egilman's proffered support for his opinions. If Dr. Egilman has not cited to reliable sources for his underlying facts or data, the Court can find that Dr. Egilman's opinions fail the first step of the *Daubert* inquiry. *Claar*, 29 F.3d at 502. The Court notes that Dr. Egilman does not cite to any support for many of his statements. The most critical statement for which Dr. Egilman offers no indication of a basis or methodology for support is that "[t]here is no important (medically relevant) qualitative difference between the vapor from butter flavoring slurry in a mixing vat and the vapor from butter flavoring slurry that is emitted from microwave popcorn that would allow any inference that chemical emitted from popped corn would neutralize the effects of diacetyl and other lung toxins that are emitted from MWPC vapors." Dr. Egilman Aff., Apr. 19, 2010 (Ct. Rec. 323 at 5) (citing nothing). Dr. Egilman also asserts, again without citing to any authority:

MEMORANDUM OPINION AND ORDER ~ 20

> The levels of diacetyl following microwave popcorn popping have been found to be similar to those found in popcorn plants. Consumers are therefore, also exposed to diacetyl in butter flavoring as a result of popping microwave popcorn. They are also at risk of having bronchiolitis obliterans and other health problems from diacetyl inhalation.

Dr. Egilman Expert Report, Sept. 15, 2009 (Ct. Rec. 248-2 at 22) (citing nothing).

> However, diacetyl is sufficient and necessary to cause lung disease in some people who inhale it, and it is present in microwave butter flavorings above the vat and above the bag of popped corn. Therefore, graphically, the facts are: Slurry=diacetyl=disease (undisputed); and the same slurry in popcorn bag=diacetyl=disease.

Dr. Egilman Aff., Apr. 19, 2010 (Ct. Rec. 323 at 8) (citing nothing).

Each of these preceding statements are important foundational assumptions on which Dr. Egilman relies for the remainder of his analysis. However, without citation to any source, the Court must conclude that those foundational statements are not based on sufficient facts or data. Reviewing all of the submitted exhibits and reports that Dr. Egilman purportedly relied on for other portions of his report and affidavits, the only report that appears to support his stated conclusion that "slurry=diacetyl=disease, therefore "same slurry in popcorn bag=diacetyl=disease" is the following statement from a 2007 U.S. Environmental Protection Agency (EPA) study: "Numerous chemicals were measurable in air exiting the chamber during microwave popcorn popping and opening. The predominant emitted

MEMORANDUM OPINION AND ORDER ~ 21

chemicals agreed with those chemicals sampled by NIOSH inside microwave popcorn manufacturing plants (Kullman et al., 2005) with the exception of methyl ethyl ketone (MEK)"  Jacky A. Rosati, Kenneth A. Krebs, Xiaoyu Liu, *Emissions from Cooking Microwave Popcorn*, 47 Critical Reviews in Food Science and Nutrition 701 (November 2007) (Ct. Rec. 330-15 at 752).

However, there is nothing to support Dr. Egilman's conclusion that is at the heart of this case:  that the vapors emitted from a microwave popcorn bag contain the same proportion of chemicals or that all of the substances in the two instances are identical.  To the contrary, at least one study considering as a side question whether the exposures of quality control workers popping microwave popcorn and mixers of butter flavoring and other ingredients experienced different exposures concluded that it was likely the exposures were qualitatively different: "Quality-control workers may have been exposed to volatile flavoring ingredients that were **qualitatively different** from those to which the other workers were exposed, because of the high temperatures generated by popping the microwave popcorn; however, their exposures exceed those likely to occur in the household by orders of magnitude." Kathleen Kreiss, MD, et al., Clinical Bronchiolitis Obliterans in Workers at a Microwave-Popcorn Plant, 347 New England J. of Medicine (August 2002) (Ct. Rec. 327-2 at 28)  (emphasis added).

MEMORANDUM OPINION AND ORDER ~ 22

If there were sufficient facts or data on which Dr. Egilman could base his formulae that vapors from slurry=diacetyl=disease and the vapors from the same slurry in popcorn bag=diacetyl=disease, then he would have formed an analytical bridge to his conclusions that microwave popcorn consumers are exposed to the same harm from diacetyl in butter flavoring as microwave popcorn workers. Without support for these assertions, however, the statements illustrate the analytical gap between the existing data and the opinion Dr. Egilman proffers. *Joiner*, 522 U.S. at 146.

Dr. Egilman also purports to rely on Plaintiffs' expert William Ewing's comparison of the average release of diacetyl in the home of another consumer, Wayne Watson, to the EPA study results. Dr. Egilman Expert Report, Sept. 15, 2009 (Ct. Rec. 248-2 at 23). Dr. Egilman concludes regarding Mr. Ewing's study: "[H]is calculations showed that Mr. Watson would have been exposed to levels that have been found to cause disease in manufacturing workers." Dr. Egilman Expert Report, Sept. 15, 2009 (Ct. Rec. 248-2 at 23) (citing "see repost [sic] of William Ewing in this case").

Yet Dr. Egilman's reliance on Mr. Ewing's report to support his conclusion is misplaced. Mr. Ewing makes no reference to Mr. Watson, Mr. Watson's home, or Mr. Watson's personal exposures to diacetyl in either Mr. Ewing's initial expert report dated September 14, 2009 (Ct. Rec. 248-6) or Mr. Ewing's revised report

MEMORANDUM OPINION AND ORDER ~ 23

dated December 14, 2009 (Ct. Rec. 248-7).  Even if Dr. Egilman were correct that

Mr. Ewing's reports in this case (Ct. Rec. 248-6; Ct. Rec. 248-7) did include

diacetyl measurements from Mr. Watson's house, Dr. Egilman's reliance on those

alleged measurements would be problematic in light of the contradictions between

Mr. Ewing's initial expert report from September 14, 2009 (Ct. Rec. 248-6) and his

revised report from December 14, 2009 (Ct. Rec. 248-7).  Dr. Egilman's reliance

on Mr. Ewing's supposed calculations regarding "Mr. Watson's" exposures is

based on insufficient data and facts.

Dr. Egilman's testimony and reports contain many other examples of

conclusions and opinions that he fails to document, which are compiled in

Addendum B.  In addition to not being supported by sufficient facts or data, Dr.

Egilman's unsupported statements would not assist the fact finder in deciding the

material questions in this case and may be misleading or confusing.  *See United

States. v. Rincon*, 28 F.3d 921, 926 (9th Cir. 1994).

## *Whether Dr. Egilman has reliably applied principles and methodology to the facts of this case*

In addition to determining whether Dr. Egilman's testimony and opinions

are based on sufficient facts or data, the Court must make a preliminary assessment

of whether Dr. Egilman's reasoning and methodology are scientifically valid.

*Daubert I*, 509 U.S. at 597.  The Court examines Dr. Egilman's conclusions to

MEMORANDUM OPINION AND ORDER ~ 24

1   determine whether those conclusions logically derive from the stated bases.

2           Evaluation of an expert's opinion testimony "requires consideration of the

3   *overall* sufficiency of the underlying facts and data, and the reliability of the

4   methods, as well as the fit of the methods to the facts of the case."  *W.R. Grace*,

5   504 F.3d at 765.  "To fulfill its gate-keeping role, the court must strike the

6   appropriate balance between admitting reliable, helpful expert testimony and

7   excluding misleading or confusing testimony." *Rincon*, 28 F.3d at 926.

8           In the previous section, the Court documented examples in which Dr.

9   Egilman provides no indication of external support for his conclusions.  In other

10  parts of his reports and testimony, Dr. Egilman relies on existing data, mostly in

11  the form of published studies, but draws conclusions far beyond what the study

12  authors concluded, or Dr. Egilman manipulates the data from those studies to reach

13  misleading conclusions of his own.  *See Daubert I*, 509 U.S. at 592-93.

14          Dr. Egilman states that, "Dr. Cecile Rose, a pulmonary specialist from

15  National Jewish in Denver, Colorado, diagnosed and reported the first case of

16  consumer popcorn lung in 2007 in Mr. Wayne Watson of Colorado."  Dr. Egilman

17  Expert Report, Sept. 15, 2009 (Ct. Rec. 248-2 at 10).  Dr. Egilman then relies

18  heavily on Dr. Rose's diagnosis and study of Mr. Watson to support his opinion

19  that consumers other than Mr. Newkirk have developed bronchiolitis obliterans

MEMORANDUM OPINION AND ORDER ~ 25

from microwave popcorn exposure.  He writes, "With respect to MWPC[5] Dr. Cecile Rose determined that a consumer, Mr. Watson, probably contracted BO from exposure to 1-2 bags of popcorn per day for several years.  She felt so strongly about this relationship that she reported it to the FDA."  Dr. Egilman Aff., Apr. 19, 2010 (Ct. Rec. 323 at 34-35).

Dr. Rose wrote to the FDA in a letter dated July 18, 2007:

We have recently identified a patient with significant lung disease whose clinical findings are similar to those described in affected workers, but whose inhalational exposure is as a heavy, daily consumer of butter flavored microwave popcorn.

(Ct. Rec. 249-5 at 723)

We measured airborne levels of diacetyl during microwave popcorn preparation in the patient's home and found levels similar to those reported in the microwave oven exhaust area in the quality assurance unit of the microwave popcorn manufacturing plant where affected workers were initially described.

(Ct. Rec. 249-5 at 724)

---

[5] "MWPC" is Dr. Egilman's shorthand for microwave popcorn (Ct. Rec. 323 at 5, note 1).

MEMORANDUM OPINION AND ORDER ~ 26

Dr. Egilman considered Dr. Rose's findings "evidence that slurry vapors from microwave popcorn can cause BO in some people, including workers and consumers." Dr. Egilman Aff., Apr. 19, 2010 (Ct. Rec. 323 at 34-35). Dr. Egilman continues, "It is not surprising that there are few known cases. Even highly toxic substances like asbestos, which most US residents have inhaled, causes relatively few mesotheliomas in people who have not worked directly with the product." Dr. Egilman Aff., Apr. 19, 2010 (Ct. Rec. 323 at 34-35).

However, Dr. Egilman's underlying methodology for his conclusions regarding Dr. Rose's work is not reliable because he provides no basis to extrapolate from Dr. Rose's letter regarding a single patient to the conclusion that slurry vapors are the same whether inhaled over a tank at a popcorn plant or from a bag of microwave popcorn, and that those vapors can cause bronchiolitis obliterans in consumers. In addition, Dr. Egilman acknowledges in his April 19, 2010, affidavit that Dr. Rose did not publish the exposure levels measured in Mr. Watson's home (Ct. Rec. 323 at 15). Therefore, Dr. Egilman had no identifiable data on which to base his conclusions, and the Court has no means to analyze whether the underlying data is reliable.

Dr. Egilman claims that Dr. Rose's statement that her "conclusions were reviewed by [her] colleagues" is a sufficient basis on which Dr. Egilman can rely

MEMORANDUM OPINION AND ORDER ~ 27

for his conclusions, including: "[c]learly Mr. Newkirk had sufficient exposure to cause disease . . . ." Dr. Egilman Aff., Apr. 19, 2010 (Ct. Rec. 323 at 16 and note 11). Dr. Rose's testimony is not the subject of the *Daubert* challenge. However, Dr. Egilman relies on Dr. Rose's statement without providing any support that such reliance is justified by sufficient facts or data. Dr. Egilman does not provide any of Dr. Rose's peer review. Although lack of peer review is not necessarily fatal to the admissibility of an expert opinion, "[i]n the absence of independent research or peer review, experts must explain the process by which they reached their conclusions and identify some type of objective source demonstrating their adherence to the scientific method." *In re Phenylpropnaolamine (PPA) Products Liability Litigation*, 289 F.Supp.2d 1230, 1238 (W.D.Wash. 2003). More importantly in this case, Dr. Rose does not even purport to adhere to the scientific method or assert that her conclusions should be extrapolated to other consumers in the absence of publication or peer review, as she herself qualifies her conclusions as follows: "It is difficult to make a causal connection based on a single case report. We cannot be sure that this patient's exposure to butter flavored microwave popcorn from daily heavy preparation has caused his lung disease. However, we have no other plausible explanation."

Dr. Cecile Rose July 18, 2007, Letter to the Food and Drug Administration (Ct. Rec. 249-5 at 724). That statement does not mean that no other plausible

MEMORANDUM OPINION AND ORDER ~ 28

explanation exists, which appears to be Dr. Egilman's conclusion.

Dr. Rose reiterated in a deposition taken on April 7, 2010, that she "wasn't sure" at the time that she first consulted on Mr. Watson's case, nor at the time of the deposition, "what the cause of [Mr. Watson's] condition is"  (Ct. Rec. 394-3, Exh. C, Deposition of Dr. Cecile Rose for Watson v. Dillon Companies, Inc., et al. at 99).  She added, "But I don't have to be sure" (Ct. Rec. 394-3, Exh. C, Deposition of Dr. Cecile Rose for Watson v. Dillon Companies, Inc., et al. at 99). Dr. Rose was not stating her conclusions for purposes of litigation in federal court; rather she shared her observations with the Food and Drug Administration possibly in an abundance of caution.

Dr. Rose's measurements were based on testing conducted by Dr. John Martyny in the kitchen at National Jewish Health in February 2007, not in Mr. Watson's kitchen or in Mr. Newkirk's kitchen (Ct. Rec. 394-4, Exh. D, Deposition of John Martyny at 18). The brands of popcorn Dr. Martyny popped included Orville Redenbacher and Act II Butter popcorn.  John Martyny Dep., Apr. 14, 2010 (Ct. Rec. 394-4 at 182).  Dr. Martyny explained that there were more measurements from some popcorn brands than others because he let certain products pop longer than others or sampled some products more than others.  John Martyny Dep., Apr. 14, 2010  (Ct. Rec. 394-4 at 182).  He elaborated that there was "no real rhyme or reason" to the methodology and clarified that the testing was

MEMORANDUM OPINION AND ORDER ~ 29

not part of "a huge study or anything . . . . We were just simply trying to just see what kind of levels we would see when we popped popcorn from a microwave." John Martyny Dep., Apr. 14, 2010 (Ct. Rec. 394-4 at 182).  He further explained that he did not draft a report on his findings based on the kitchen tests or the measurements taken from Mr. Watson's home because the measurements in Mr. Watson's home "weren't, obviously, very significant" and "were all nondetect." John Martyny Dep., Apr. 14, 2010 (Ct. Rec. 394-4 at 183).

Dr. Egilman relies on the findings of Dr. Rose and Dr. Martyny despite their own reflections that the methodology underlying their work with Mr. Watson could not support extrapolating to general causation for a broader group of consumers.  Therefore, Dr. Egilman's opinions based on Dr. Rose and Dr. Martyny's examination of Mr. Watson's potential exposures are not based upon sufficient facts or data or the product of reliable principles and methods.  *See* Fed. R. Evid. 702.

Dr. Egilman's opinions fall below the threshold standard of scientific validity in other ways.  To qualify as "scientific knowledge" under Fed. R. Evid. 702, "an inference or an assertion must be derived by the scientific method." *Daubert I*, 509 U.S. at 590.  "Coming to a conclusion first and then doing research to support it is the antithesis of this method.  Certainly scientists may form initial tentative hypotheses.  However, scientists whose conviction about the ultimate

MEMORANDUM OPINION AND ORDER ~ 30

conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method." *Claar v. Burlington Northern R. Co.*, 29 F.3d 499, 502-03 (9th Cir.1994).

Dr. Egilman's conclusions in his September 15, 2009, report that "levels of diacetyl exposure below and around 1 ppm can cause bronchiolitis obliterans and other respiratory illnesses" and that "Mr. Newkirk, within a reasonable degree of medical certainty developed lung disease as a result of inhaling flavors released by microwaved popcorn," Dr. Egilman Expert Report, Sept. 15, 2009 (Ct. Rec. 248-2 at 50), preceded his actual estimation of the levels of diacetyl to which Mr. Newkirk was exposed.  Dr. Egilman Supp. Aff., Apr. 26, 2010 (Ct. Rec. 325 at 1-2) and Dr. Egilman Aff., Apr. 19, 2010 (Ct. Rec. 323 at 17).  In his affidavit of April 19, 2010, for the first time, he applies a formula to calculate "Mr. Newkirk's actual exposures" even though Dr. Egilman's formula is based on a variety of studies that existed prior to his September 15, 2009, expert witness report in which he stated his conclusions (Ct. Rec. 323 at 17) (relying on Richard Kanwal, MD, MPH, et al., *Evaluation of Flavorings-Related Lung Disease Risk at Six Microwave Popcorn Plants*, , 48 Journal of Occupational and Environmental Medicine 149 (February 2006) (Ct. Rec. 248-20); Richard Kanwal, et al., *NIOSH*

MEMORANDUM OPINION AND ORDER ~ 31

*Health Hazard Evaluation Report, HETA # 2000-0401-2991, Gilster-Mary Lee Corporation, Jasper Missouri* (January 2006) (Ct. Rec. 248-18), and Richard Kullman, et al., *NIOSH Health Hazard Evaluation Report, HETA #2006-0195-3044, Yatsko's Popcorn, Sand Coulee, Montana* (April 2007). In addition, Dr. Egilman refers to the "attached analysis," which includes a copy of the report conducted by Dr. Su-Jung (Candace) Tsai and Dr. Michael Ellenbecker at Dr. Egilman's direction and is dated April 23, 2010 (Ct. Rec. 326).

In summary, the chronology of Dr. Egilman's process or methodology for determining consumer exposure levels to diacetyl was as follows. Prior to September 2009, Dr. Egilman relies on studies of diacetyl exposure levels for workers conducted in microwave popcorn plants using a number of different microwave popcorn brands and types. On September 15, 2009, Dr. Egilman drafts his expert opinion report stating that consumer exposure levels to diacetyl would be equivalent to exposure levels to microwave popcorn workers and could cause bronchiolitis obliterans and that Mr. Newkirk contracted bronchiolitis obliterans from microwave popcorn vapor (Ct. Rec. 248-2). In January 2010, Dr. Egilman defends his conclusions in a deposition. Dr. Egilman Dep., Jan. 26, 2010 (Ct. Rec. 248-19). Between the January deposition and April, Dr. Egilman commissioned a study by Drs. Tsai and Ellenbecker to "figure out how long diacetyl stayed in the air based on physics and chemistry" and to "actually calculate a dose or an

MEMORANDUM OPINION AND ORDER ~ 32

exposure." Dr. Egilman Dep., April 27, 2010, In the Matter of: *Elaine Khoury, et al. v. Conagra Foods, Inc. et al.* (Ct. Rec. 509-18 at 83-84). Finally, in April 2010, Dr. Egilman augmented his expert opinion through lengthy affidavits in this case and through a deposition in another case providing for the first time calculations based on the Tsai and Ellenbecker formulae developed for litigation purposes. Dr. Egilman Aff., Apr. 19, 2010 (Ct. Rec. 323); Dr. Egilman Supp. Aff., Apr. 26, 2010 (Ct. Rec. 325); Dr. Egilman Dep., Apr. 27, 2010, In the Matter of: *Elaine Khoury, et al. v. Conagra Foods, Inc. et al.* (Ct. Rec. 509-18 at 83-84). This is not a reliable scientific method of drawing a hypothesis, conducting studies to test the hypothesis, and then arriving at a conclusion. *Claar*, 29 F.3d at 502-03.

Dr. Egilman also fails to apply reliable scientific methods when he extrapolates from extremely small samplings to make sweeping conclusions. For example, after reciting that the ConAgra Marion plant had two quality control workers who were potentially exposed to 18 ppb concentration of diacetyl and whose spirometry tests returned abnormal results, Dr. Egilman adopts the position that exposure of 18 ppb is sufficient to cause spirometry abnormalities, despite the fact that a report from only two people is an extremely small sample (Ct. Rec. 323 at 40-41). *See Henricksen v. ConocoPhillips Co.*, 605 F.Supp.2d 1142, 1168 (E.D.Wash. 2009) (excluding an expert dose opinion where small sample sizes resulted in great uncertainty as to potential rate of error).

MEMORANDUM OPINION AND ORDER ~ 33

Similarly, Dr. Egilman refutes Defendants' statement that "QC workers collected slurry samples" with the following statements: "I have performed a site visit to the Jasper GML[6] plant and interviewed QC workers. They did not collect 'slurry samples.' They did not analyze 'slurry samples.' Quality control work consisted of popping and tasting microwave popcorn." Dr. Egilman Aff., Apr. 19, 2010 (Ct. Rec. 323 at 19).  The Court finds that Dr. Egilman's reliance on a single "site visit to the Jasper GML plant" and accompanying interviews is not a reliable method through which to conclude that no quality control workers in any microwave popcorn plant ever collect slurry samples.  *See Rink v. Cheminova, Inc.,* 400 F.3d 1286, 1292 (11th Cir.2005) (excluding expert testimony because expert's method of transposing data from other studies based on such conjecture and rough approximation that the method lacked the "intellectual rigor" required by *Daubert*).

Dr. Egilman also relies on Kathleen Kreiss's study in a misleading or convoluted way to support his general causation opinion that diacetyl causes bronchiolitis obliterans in microwave popcorn consumers. Dr. Egilman Expert Report, Sept. 15, 2009 (Ct. Rec. 248-2 at 42) (relying on Kathleen Kreiss, MD, et al., Clinical Bronchiolitis Obliterans in Workers at a Microwave-Popcorn Plant, 347 New England J. of Medicine (August 2002)).  According to Dr. Egilman, the Kreiss article states that "[e]mployees who worked in quality control, maintenance

---

[6] Gilster-Mary Lee

MEMORANDUM OPINION AND ORDER ~ 34

packaging or mixing had significantly higher rates of respiratory symptoms than those who worked in other areas of the plant with lower exposures to diacetyl" and that "workers in the higher exposure category were 6.2 times as likely to experience exertional shortness of breath than those working in the low-exposure areas of the plant." Dr. Egilman Expert Report, Sept. 15, 2009 (Ct. Rec. 248-2 at 42).

However, this report was based on survey responses of 117 employees at the Missouri popcorn plant where the cluster of 8 employees with severe bronchiolitis obliterans was first identified in 2000. Kathleen Kreiss, MD, et al., Clinical Bronchiolitis Obliterans in Workers at a Microwave-Popcorn Plant, 347 New England J. of Medicine (August 2002) (Ct. Rec. 327-2 at 21). The study does not address consumer exposure and does not support extrapolating from the occupational context to the consumer context, which is the causation issue in this case. It is true that the study includes the five quality assurance workers who participated in the survey in the following finding: "Workers in the microwave-popcorn production areas (including quality-control and maintenance workers) had significantly higher rates of exertional shortness of breath, regular trouble with breathing, a combination of two or more respiratory symptoms, unusual fatigue, and any systemic symptoms than minimally exposed workers in other areas of the plant" (Ct. Rec. 327-2 at 23). However, the study's central finding was that "the

MEMORANDUM OPINION AND ORDER ~ 35

estimated cumulative exposure to diacetyl was correlated with chronic effects on lung function, in terms of both the rates of abnormalities on spirometry and the average decreases in FEV1 in quartiles of increasing cumulative exposure" (Ct. Rec. 327-2 at 27).

The study's measurements of exposure at the plant revealed that air samples in the mixing room work area contained a mean concentration of diacetyl of 32.27 parts per million (ppm) while the concentration of diacetyl in the samples taken in the quality control or maintenance work area was 0.56 ppm.  The authors' recommendation to "isolate[] . . . ventilation in the mixing room from that in other areas of the plant"  indicates that butter-flavoring vapors from the mixing rooms reached other areas of the plant (Ct. Rec. 327-2 at 28).  The authors further found: "Quality-control workers may have been exposed to volatile flavoring ingredients that were **qualitatively different** from those to which the other workers were exposed, because of the high temperatures generated by popping the microwave popcorn; however, their exposures exceed those likely to occur in the household by orders of magnitude" (Ct. Rec. 327-2 at 28) (emphasis added).

Dr. Egilman then cites a December 2004 NIOSH health hazard evaluation report for one popcorn plant, the  ConAgra Snack Foods plant in  Marion, Ohio, for the proposition that: "[a]ffected workers have been found at plants with mean area exposures as low as 0.02 ppm." (Id. at 22).  Dr. Egilman's selection of the 0.02

MEMORANDUM OPINION AND ORDER ~ 36

ppm diacetyl concentration measurement is misleading when read in the context of the full Marion report. *See* Richard Kanwal and Greg Kullman, *NIOSH Health Hazard Report at ConAgra Snack Foods, Marion, Ohio* at iv (December 2004) (Ct. Rec. 249 at 567).

Specifically, NIOSH scientists first visited the Marion, Ohio, ConAgra plant in January 2003 and observed the following: "[W]orkers handled many different butter flavorings in open containers and poured the flavorings into open tanks of heated soybean oil.  The tanks did not have local exhaust ventilation and the workers did not use respiratory protection.  Oil and flavoring mixing activities and all heated tanks were located in one room (slurry room) adjacent to the packaging line area, and the air pressure in this room was positive relative to the packing line area."  Richard Kanwal and Greg Kullman, *NIOSH Health Hazard Evaluation Report, HETA # 2004-0112-2949, ConAgra Snack Foods, Marion, Ohio* (December 2004) (Ct. Rec. 249 at 567).   NIOSH staff conducted health and environmental surveys of the plant in March 2003 and found the following mean time weighted average diacetyl air concentrations, according to areas of the plant: (1) 1.14 ppm in the slurry/mixing room, where 3 of the 12 current slurry room workers had health findings "consistent with bronchiolitis obliterans"; (2) 0.02 ppm in the packaging area, where five workers had "fixed obstruction on spirometry, normal diffusing capacity, and no history of work in the slurry room";

MEMORANDUM OPINION AND ORDER ~ 37

and (3) 0.018 ppm in the quality assurance lab before an enclosure with exhaust ventilation for the microwave ovens was installed (Ct. Rec. 249 at 581).

Two of the eleven workers in the quality assurance area had abnormal spirometry, with one demonstrating obstruction or mixed pattern abnormalities and the other demonstrating restriction (Ct. Rec. 249 at 588).  Between January and March 2003, ConAgra made adjustments to the slurry room ventilation, and by the time the environmental study was undertaken in March, the slurry room had negative air pressure relative to the packaging area (Ct. Rec. 249 at 567).  ConAgra also made changes to the ventilation system between January and March that "decreased the potential for slurry room emissions to contaminate the packaging area."  In light of these changes, the NIOSH report proposed that "the March 2003 diacetyl air concentrations in the packaging area may underestimate past exposures" and concluded that "higher exposures in the past may explain the greater than expected numbers of packaging-line workers" reporting respiratory ailments, and revealing respiratory obstruction on NIOSH spirometry tests (Ct. Rec. 249 at 581).  *See also* (Ct. Rec. 249 at 567).

The Marion study, therefore, does not purport to show an association between the 0.02 ppm diacetyl concentration and the workers' negative health effects, as Dr. Egilman's indicates.  *See* Richard Kanwal and Greg Kullman, *NIOSH Health Hazard Evaluation Report, HETA # 2004-0112-2949, ConAgra*

MEMORANDUM OPINION AND ORDER ~ 38

*Snack Foods, Marion, Ohio* (December 2004) (Ct. Rec. 249).  Moreover, Dr.

Egilman cites no other authority for the analytical step he takes from observing that

there is no accepted "safe" level of diacetyl exposure to concluding that even

concentrations as low as 0.02 ppm are harmful.  There is, then, no reliable

methodology supporting Dr. Egilman's opinion that mean time weighted average

diacetyl air concentrations as low as 0.02 ppm can cause bronchiolitis obliterans or

other airways obstruction.

Dr. Egilman also praises the Marion study for combining into one group the

workers in the slurry room and the quality assurance lab workers. Dr. Egilman

Aff., Apr. 19, 2010 (Ct. Rec. 323 at 20); Richard Kanwal and Greg Kullman,

*NIOSH Health Hazard Evaluation Report, HETA # 2004-0112-2949, ConAgra*

*Snack Foods, Marion, Ohio* (December 2004) (Ct. Rec. 249 at 576).  However,

that study combined slurry room and quality assurance lab workers solely for

measurements recorded in a single table that reported the "Numbers of slurry room

and QA workers reporting respiratory symptoms and physician diagnosed

respiratory disease, and with abnormal spirometry test results, compared to the

numbers expected from NHANES III[7] (adjusted for age, sex, race, and smoking

---

[7] "NHANES III" is the abbreviation for the National Health Examination Survey,

Cycle III.  (Ct. Rec. 249 at 573); Centers for Disease Control and Prevention web

site, http://www.cdc.gov/nchs/nhanes/nhanes_questionnaires.htm (last visited June

MEMORANDUM OPINION AND ORDER ~ 39

status).  (Ct. Rec. 249 at 590).  The report explained the decision to combine the slurry room and QA workers as follows: "Slurry room and QA lab workers were combined into one group due to the small numbers of workers in each group, and because of the known occurrence of increased risk in both these groups in other microwave popcorn plants"  (Ct. Rec. 249 at 576).  Yet Dr. Egilman relies on that statement to support his much broader conclusion that "More importantly, this is further evidence that NIOSH did not consider qualitative differences between exposures for mixers and QA workers to be important."  Dr. Egilman Aff., Apr. 19, 2010 (Ct. Rec. 323 at 20).  Again, there is an analytical gap between this conclusion and the content of the Marion report.

    Nor does Dr. Egilman reliably apply principles and methodologies from animal studies to the facts of this case.  Dr. Egilman supports his conclusions regarding the dose-response relationship by citing to an animal study of respiratory symptoms in rats.  Dr. Egilman Expert Report, Sept. 15, 2009 (Ct. Rec. 248-2 at 43) (citing "Hubbs AF, Battelli LA, Goldsmith WT, et al. Necrosis of Nasal and Airway Epithelium in Rats Inhaling Vapors of Artificial Butter Flavoring. Toxicol Appl Pharmacol 2002;185:128-135").  Dr. Egilman states, "Several animal studies 22, 2010).  The survey "is a program of studies designed to assess the health and nutritional status of adults and children in the United States."

http://www.cdc.gov/nchs/nhanes.htm (last visited June 22, 2010).

MEMORANDUM OPINION AND ORDER ~ 40

have shown a relationship between diacetyl exposure and decreased lung function
and necrosis of airway epithelial tissue.  Dr. Egilman Expert Report, Sept. 15, 2009
(Ct. Rec. 248-2 at 44-46) (citing "Morgan DL, Flake G, Kirby PJ. Respiratory
Tract Toxicity of Diacetyl in C57BLl6 Mice. SOT 2006 Annual Meeting, Abstract
1029; 22 Hubbs AF. Battelli LA, Goldsmith WT, et al. Necrosis of Nasal and
Airway Epithelium in Rats Inhaling Vapors of Artificial Butter Flavoring. Toxico1
Appl Pharmacol 2002; 185: 128-135; BASF Department of Toxicology.
Confidential Report: Study on the acute inhalation of toxicity LC50 of diacetyl
FCC as a vapor in rats, 4-hour exposure. 1993").  Dr. Egilman noted that 2 of 19
rats exposed to medium or high (above 285 ppm) exposure of diacetyl died after 6
hours of exposure.  Dr. Egilman Expert Report, Sept. 15, 2009 (Ct. Rec. 248-2 at
45).

Extrapolating from the animal studies, Dr. Egilman draws the following
conclusion under the label of "analogy":

> Analogy: Other substances have proved toxic when inhaled, some also
> causing changes in the respiratory epithelium. O3 (ozone) has been
> shown to change the tracheal epithelia of guinea pigs and cause
> airway reactivity both in vitro and in vivo. [internal citation omitted]
> Chlorine and other exposures are accepted causes of BO. In all cases
> these cause-effect relationships were accepted by the medical
> community based on case reports only. The analysis of the scientific
> data according to Hill's considerations clearly shows that diacetyl is a
> cause or contributing cause of bronchiolitis obliterans and other
> respiratory tract disease in humans.

MEMORANDUM OPINION AND ORDER ~ 41

Dr. Egilman Expert Report, Sept. 15, 2009 (Ct. Rec. 248-2 at 46-47).

Expert opinion relying on animal studies to reach an opinion on causation in humans is usually admissible when the expert explains how and why the results of the animal toxicological study can be extrapolated to humans. *General Electric Co. v. Joiner*, 522 U.S. 136, 143-45 (1997) (holding that district court did not abuse its discretion in excluding expert testimony on causation based on expert's failure to explain how animal studies supported expert's opinion that agent caused disease in humans); *Lopez v. Wyeth-Ayerst Laboratories, Inc.*, 139 F.3d 905 (9thCir.1998) (recognizing that animal studies can contribute to an expert's scientific conclusion as to causation but finding expert's opinions should have been excluded where there was an analytical gap between the study's findings and the experts' conclusions regarding the specific plaintiff); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir.1994), cert. denied, 513 U.S. 1190 (1995). Dr. Egilman offers no analytical bridge between the animal studies finding harm from diacetyl exposure to rats and his conclusion that those studies demonstrate that diacetyl exposure causes decreased lung function and necrosis of epithelial tissue in humans. He offers no explanation for how and why the results of those studies can be extrapolated to humans. *See Joiner*, 522 U.S. at 143-45. His methodology with respect to relying on animal studies to support his opinions is unreliable for purposes of FRE 702.

MEMORANDUM OPINION AND ORDER ~ 42

Dr. Egilman also cited the "Rosati Study," an EPA study conducted in 2007 regarding seventeen types of microwave popcorn from eight different brands.  Dr. Egilman Expert Report, Sept. 15, 2009 (Ct. Rec. 248-2, at 48); Jacky A. Rosati, Kenneth A. Krebs, Xiaoyu Liu, *Emissions from Cooking Microwave Popcorn*, 47 Critical Reviews in Food Science and Nutrition 701 (November 2007) (Ct. Rec. 330-15 at 755).  In his April 27, 2010, deposition, Dr. Egilman was asked as to whether he considered the ConAgra-commissioned "Aspen" study or the EPA/Rosati studies to be exposure studies, and he replied yes.  (Ct. Rec. 394-2 at 86)  Specifically, Dr. Egilman also was asked the following questions:

> Q.     Did you consider the Aspen study to be an exposure study?
> A.     That's how they first defined it, yes.
> Q.     Do you consider the Rosati study done from the EPA to be an exposure study?
> A.     Why don't you define what you mean by exposure.
> Q.     Fair enough. Do you understand that the purpose of the Aspen study, or a purpose of the Aspen study was to do quantitative exposures for a consumer?
> A.     That's my understanding.

(Ct. Rec. 394-2 at 86).

However, the EPA/Rosati study, by its own terms, is not an exposure study. The study report concludes with the statement: "This was a source characterization study and the potential exposure to the compounds measured and any associated potential risks were not estimated."  Jacky A. Rosati, Kenneth A. Krebs, Xiaoyu

MEMORANDUM OPINION AND ORDER ~ 43

Liu, *Emissions from Cooking Microwave Popcorn*, 47 Critical Reviews in Food Science and Nutrition 701 (November 2007) (Ct. Rec. 330-15 at 755). The EPA study made no findings as to whether the amount of diacetyl emitted was enough to cause respiratory obstruction; it did not measure the diacetyl concentration to which a consumer would be exposed during or after popping popcorn in a microwave (Ct. Rec. 330-15 at 755). The EPA instead measured the chemicals emitted from a bag of popped microwave popcorn (Ct. Rec. 330-15 at 755). Dr. Egilman's characterization of the study as an exposure study when, by its own terms, it is not, indicates that Dr. Egilman did not reliably apply the methodology of that study to the facts of this case. *See* Fed. R. Evid. 702.

Dr. Egilman also includes legal conclusions throughout his expert report and affidavits. Yet Dr. Egilman has not presented any credentials to support his qualifications as a legal expert. Expert testimony is properly excluded where the witness is no more capable than the factfinder to draw a conclusion. *See Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051, 1059-60 (9th Cir.2008) ("[A]n expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law.") (quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir.2004)). For example, Dr. Egilman fills his expert report with "opinions" that are actually legal conclusions, such as "Opinion: ConAgra knew that exposures from popping popcorn presented a

MEMORANDUM OPINION AND ORDER ~ 44

potential inhalation health hazard and continued selling butter popcorn flavoring containing diacetyl until 2007.  They failed to warn consumers or customers (retailers) about this risk." (Ct. Rec. 248-2 at 65).  Elsewhere he labors to distinguish a case relied on by Defendants' counsel in their briefing to this court, *Henricksen v. Conoco Phillips Co.*, 605 F.Supp.2d 1142 (E.D.Wash. 2009).  Dr. Egilman states that the difference is that "[b]enzene was established as a leukemogen (a leukemia-causing substance) in studies where it was studied alone, not a component of gasoline or any other mixture."  (Ct. Rec. 323 at 9) (citing nothing).  However, Dr. Egilman fails to cite to any authority regarding that proposition.  In addition, he fails to establish any personal knowledge regarding benzene testing.

### ___*Whether Dr. Egilman's testimony is the product of reliable principles and methods*___

The Court concludes that one illustration of lack of reliable methodology is when the expert has arrived at contradictory conclusions using the same methodology.  In his April 2010 affidavits, Dr. Egilman discounts some of the very studies he relied upon in his September 15, 2009, expert report and April 2010 affidavits with conclusory statements, such as "unreliable due to humidity."  For example, after repeatedly relying on NIOSH data and conclusions he states:

Unfortunately most studies have based exposure measurements on

MEMORANDUM OPINION AND ORDER ~ 45

1
2
3
4
5
6

> NIOSH method 2557; the results of these studies have been shown to be unreliable due to humidity. Therefore, most of the dose estimates taken by ConAgra and NIOSH are incorrect and cannot be relied on to establish a dose-response relationship for chronic exposures. Some exposure measurements were taken using a Fourier transform infrared (FTIR) gas analyzer. At the present time, there is no indication that these measurements are inaccurate. These were used to establish peak exposures from slurry vapors emitted from MWPC.

7

Dr. Egilman Aff., Apr. 19, 2010 (Ct. Rec. 323 at 38).

8
9
10

Another example of internal contradiction is Dr. Egilman's treatment of

gastroesophogeal reflux disease (GERD) and bronchiolitis obliterans syndrome.

11
12

He states that the only study that has been released on the subject was published

13

after his first expert report and stated that "prospective studies are now required to

14

investigate a causal association between GERD and the development of BOS . . . ."

15
16

Dr. Egilman Aff., Apr. 19, 2010 (Ct. Rec. 323 at 72). Despite that quotation from

17

the only published study, Dr. Egilman states: "Acid reflux did not cause BO to

18
19

occur earlier than it otherwise would have" (Ct. Rec. 323 at 72). Dr. Egilman

20

provides no basis for his confidence in making a conclusion that the authors

21
22

explicitly stated was premature without additional data.

23

Dr. Egilman then applies contradictory logic in attempting to distinguish

24

between vapors from microwave popcorn and slurry vapors in the manufacturing

25
26

work site by stating that "[t]hese vapors have not been tested, and therefore, there

27

is no way to be sure that the composition of inhaled vapors is actually different at

28

MEMORANDUM OPINION AND ORDER ~ 46

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

all." Dr. Egilman Aff., Apr. 19, 2010 (Ct. Rec. 323 at 7).  The same logic can be

applied to the central thrust of Dr. Egilman's opinion: if the vapors have not been

tested, how can Dr. Egilman assert that the vapors from microwave popcorn are

qualitatively identical to slurry vapors and are causing the same harm that slurry

vapors likely caused?

      Dr. Egilman proceeds to contradict himself again in attempting to explain

why exposure to naturally occurring diacetyl through consumption of foods such as

"coffee, dairy products, yogurt, wine, beer and other products" does not contribute

to lung disease.  Dr. Egilman Aff., Apr. 19, 2010 (Ct. Rec. 323 at 70-71).  Those

contradictions, set out in the following paragraphs, cast further doubt on Dr.

Egilman's methodology.  Dr. Egilman states:

> It is true that coffee, dairy products, yogurt, wine, beer and other
> products all contain diacetyl. . . . I am unaware of any peer reviewed
> published studies that have measured exposures to these other
> products that cause lung disease. I understand that most of these
> products release so little diacetyl that it would not be measurable with
> standard methods (Personal communication with Mark Rigler).
> Newkirk deposition. Therefore, I consider any exposure to diacetyl
> that constituted less than .00001 percent of his total exposure to be
> trivial, and I would not consider it to be a significant contributing
> factor in causing his disease.

Dr. Egilman Aff., Apr. 19, 2010 (Ct. Rec. 323 at 70).

>  Diacetyl concentrations in naturally fermented products for
> consumption range from 0.5-1.0 ppM (less than .001%).  Apt, C.M.
> (Ed.).  On the other hand, diacetyl comprises 2-10% or more of slurry.
> ACT II Butter Lover's, one of two ConAgra microwave popcorn

MEMORANDUM OPINION AND ORDER ~ 47

flavors Mr. Newkirk regularly consumed, contained 28.7 ppM of diacetyl at the point source when a popped bag of microwave popcorn was opened. Watson report attachment B at 38. Therefore, diacetyl exposures from foods are thousands to millions of times lower than those from slurry vapors emitted from microwave popcorn or above mixing tanks. If concentrations of diacetyl in these "natural" products were shown to be comparable to those from slurry, they could have contributed to his lung disease. Under these hypothetical circumstances, Mr. Newkirk's exposure to diacetyl from naturally fermented products combined with his exposure to diacetyl from artificial butter flavoring in microwave popcorn, would have been joint causes of his lung disease.

Dr. Egilman Aff., Apr. 19, 2010 (Ct. Rec. 323 at 70-71).

These two paragraphs again illustrate problems in Dr. Egilman's opinions as a whole. First, Dr. Egilman states that he is "unaware of any peer reviewed published studies that have measured exposures to these other products that cause lung disease" but then asserts that "[d]iacetyl concentrations in naturally fermented products for consumption range from 0.5-1.0 ppM (less than .001%)."  Dr. Egilman Aff., Apr. 19, 2010 (Ct. Rec. 323 at 70-71).  It is unclear whether Dr. Egilman is saying in the first statement that the products cause lung disease but have not been measured in peer reviewed studies or, alternatively, that there have been no peer reviewed studies that have produced exposure measurements showing that exposure rates to naturally-occurring diacetyl are high enough to cause lung disease.  If Dr. Egilman intends to say the former, that exposures to diacetyl through consumption of certain foods have not been measured in peer-reviewed

MEMORANDUM OPINION AND ORDER ~ 48

studies, then his statement a few lines down that "[d]iacetyl concentrations in naturally fermented products for consumption range from 0.5-1.0 ppM" indicates that diacetyl concentrations, to the contrary, have been measured.  Dr. Egilman's vague citation to "Apt, C.M. (Ed.)" does nothing to clarify the matter.  Dr. Egilman Aff., Apr. 19, 2010 (Ct. Rec. 323 at 71).

Second, Dr. Egilman provides no explanation for why 1ppm concentration of diacetyl in fermented foods is insignificant when he vigorously opined that "studies also suggest that levels of diacetyl exposure below and around 1 ppm can cause BO and other respiratory illnesses."  Dr. Egilman Aff., Apr. 19, 2010 (Ct. Rec. 323 at 70-71); Dr. Egilman Expert Report, Sept. 15, 2009 (Ct. Rec. 248-2 at 50).  This is yet another analytical gap in his opinions.

Third, Dr. Egilman asserts that the Act II Butter Lover's popcorn, which Mr. Newkirk alleges he consumed, released "28.7 ppM of diacetyl at the point source when a popped bag of microwave popcorn was opened. Watson report attachment B at 38."  Dr. Egilman Aff., Apr. 19, 2010 (Ct. Rec. 323 at 71).  Point source emissions are not exposure measurements.  Jacky A. Rosati, Kenneth A. Krebs, Xiaoyu Liu, *Emissions from Cooking Microwave Popcorn*, 47 Critical Reviews in Food Science and Nutrition 701 (November 2007) (Ct. Rec. 330-15 at 755) ("This was a source characterization study and the potential exposure to the compounds measured and any associated potential risks were not estimated.").  Moreover, Dr.

MEMORANDUM OPINION AND ORDER ~ 49

Egilman relies for support on an attachment that the Court could not find despite diligent searches of the affidavit to which Dr. Egilman claims a Watson report is attached, Ct. Rec. 323 at 70, as well as the extensive other filings regarding the *Daubert* and summary judgment motions.

Fourth, Dr. Egilman is again using "slurry" and "microwave popcorn vapors" interchangeably without any scientifically sound basis to do so.

### *Not helpful to the trier of fact*

Two of Dr. Egilman's opinions stand out as reliable by being supported by existing data and in line with the expert opinions offered by both Plaintiffs and Defendants in this case.  First, Dr. Egilman asserts, "Clinical epidemiology presents sufficient evidence to warrant concern for causation of chronic lung injury (fixed obstructive disease) associated with the production of butter-flavored popcorn in exposed workers." Dr. Egilman Aff., Apr. 19, 2010 (Ct. Rec. 323 at 5) (purporting to cite Defense expert Dr. Kendall Wallace, but not clearly indicating which document Dr. Egilman is citing).  Second, Dr. Egilman concedes that: "ConAgra is correct in noting that, aside from Dr. Rose's report to four governmental agencies (FDA, CDC, EPA and OSHA), there are no published papers on consumer cases."  Dr. Egilman Aff., Apr. 19, 2010 (Ct. Rec. 323 at 74). Although supported by existing data, these opinions are inadmissible under Fed. R. Evid. 702 on the basis that they would be unhelpful to a trier of fact in this case.

MEMORANDUM OPINION AND ORDER ~ 50

### *Conclusion regarding general causation and specific causation testimony of Dr. Egilman*

There is simply too great an analytical gap between the existing data, indicating that exposure to butter flavoring vapors in the occupational setting can cause bronchiolitis obliterans, and Dr. Egilman's opinion that a consumer of microwave popcorn is exposed to a vaporized substance equivalent to production plant butter flavoring vapors at levels sufficient to cause bronchiolitis obliterans. *See Joiner*, 522 U.S. at 146.  The bulk of Dr. Egilman's conclusions do not rise above "subjective belief or unsupported speculation."  *See Joiner*, 522 U.S. at 136. His opinion testimony, therefore, is inadmissible under *Daubert* and Fed. R. Evid. 702.

### 4.  Motions to Exclude the Specific Causation Testimony of Plaintiffs' Other Expert Witnesses

Also before the Court are Defendants' Joint Motions to Exclude the Specific Causation Testimony of Plaintiffs' Experts  Dr. Pue, Ct. Rec. 234, Dr. Parmet, Ct. Rec. 237, and Mr. Ewing, Ct. Rec. 240.  Defendants rely on Fed. R. Evid. 702 and *Daubert* to argue that each of these expert's testimony on specific causation should be excluded because there is an absence of admissible evidence of general causation.  The main thrust of Defendants' argument is that without admissible

MEMORANDUM OPINION AND ORDER ~ 51

evidence of general causation, there is no basis for Plaintiffs' expert witnesses to testify regarding specific causation.

If a plaintiff is not able to establish general causation, it is unnecessary to consider whether the plaintiff can establish specific causation. *See Raynor v. Merrell Pharmaceuticals Inc.,* 104 F.3d 1371, 1376 (D.C.Cir. 1997).

> In cases that require medical evidence to establish causation, courts have typically drawn a distinction between "general causation" and "specific causation." Reference Manual on Scientific Evidence 444 (2d. ed. 2000). General causation "is established by demonstrating . . . that exposure to a substance can cause a particular disease." *Id.* Specific, "or individual, causation, however is established by demonstrating that a given exposure is the cause" of a particular individual's disease. *Id.*"

*Dunn v. Sandoz Pharmaceuticals Corp.*, 275 F. Supp. 2d 672, 676 (M.D.N.C. 2003).

Doctors Pue and Parmet conduct differential diagnoses to conclude that Mr. Newkirk suffered bronchiolitis obliterans and other respiratory ailments as a result of his consumption of microwave popcorn.   However, a physician's opinion on causation based on a differential diagnosis must first meet the requirement that the alleged path of specific causation is scientifically plausible.  *Navigating Uncertainty: Gatekeeping in the Absence of Hard Science*, 113 Harv. L. Rev. 1467, 1474 (2000).   "Once a plaintiff has shown general causation, the trial court faces the issue of specific causation: whether the alleged cause did in fact produce the plaintiff's injury."  *Id. at 1475.*

MEMORANDUM OPINION AND ORDER ~ 52

### *Dr. Pue*

In addition to Defendants' main argument that each of the expert's specific causation testimony should be excluded because there is no evidence supporting general causation, Defendants contend that Dr. Pue's testimony is barred by Fed. R. Evid. 702, because Dr. Pue's testimony is not the product of reliable principles and methods.   Defendants cite the following reasons for concluding that Dr. Pue's testimony should be excluded:  Dr. Pue did not establish a safe level of microwave popcorn vapor exposure; Dr. Pue did not establish Mr. Newkirk's actual exposure level; and Dr. Pue did not adequately rule out plausible alternative causes for Newkirk's disease and ailments.  (Ct. Rec. 235 at 2).

In his deposition, Dr. Pue testified that he had not been provided with anything that allowed him to quantify the amount of butter flavoring chemicals to which Mr. Newkirk actually had been exposed and that he could only speculate as to the actual exposure of diacetyl and other chemicals.  (Ct. Rec. 248-16 at 290-91, Citurs Ex. P, Pue Dep. at 163:2-8, 166:20-167:1).  Dr. Pue testified that he had not seen any studies supporting the amount of consumer exposure to diacetyl from microwave popcorn in a home environment (Ct. Rec. 248-8 at 204-05; Citurs Dec. Ex. H, Pue Dep. at 197-198).  Dr. Pue further testified that:  "There was a gentleman who was seen at National Jewish, and Dr. Rose I understand sent her

MEMORANDUM OPINION AND ORDER ~ 53

industrial hygienist into his house and did sampling of the microwave levels or

popcorn levels in his house, and again, I was not allowed to see those results.  I

asked for them.  I'm not allowed to see them."  (Ct. Rec. 248-8 at 205, Citurs Dec.

Ex H, Pue Dep. at 198).   Dr. Pue also testified in a deposition that he had no basis

for knowing whether the chemical exposure to microwave workers was the same

chemical exposure as to microwave popcorn consumers or whether there is a safe

exposure level for consumers of microwave popcorn vapors.  Dr. Pue Dep., Jan.

15, 2010 (Ct. Rec. 248-16 at 287).

    The Court finds that Dr. Pue's testimony regarding specific causation fails to

satisfy the standards set by Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm.,*

*Inc.,* 509 U.S. 579 (1993).   First, Dr. Pue's specific causation testimony resulting

from his differential diagnosis relied on Dr. Egilman's general causation testimony

that the Court excluded.  Without general causation established, Dr. Pue's specific

causation testimony fails.  *See Hall v Baxter Healthcare Corp.,* 947 F. Supp. 1387,

1413 (D.Or. 1996)("Testimony regarding specific causation in a given patient is

irrelevant unless general causation is established"*(*citing *DeLuca v. Merrell Dow*

*Pharmaceuticals, Inc.*, 911 F.2d at 958*; Jones*, 933 F. Supp. at 900; *Rutigliano v.*

*Valley Business Forms*, 929 F. Supp.779, 783 (D.N.J. 1996)*; Grimes v. Hoffmann-*

*LaRoche, Inc.*, 907 F. Supp. 33, 38 (D.N.H. 1995)*; Hopkins v. Dow Corning Corp.*,

33 F.3d 1116 *(*9th Cir. 1994)*).*  Second, the Court finds that Dr. Pue did not

MEMORANDUM OPINION AND ORDER ~ 54

conduct an independent analysis of general causation pursuant to Fed. R. Evid. 702

principles on which to base his differential diagnosis nor base his specific

causation opinion on reliable facts and data.

Therefore, the Court grants Defendants' Motion to Exclude the Specific

Causation Testimony of Dr. Pue.

### ***Dr. Parmet***

Dr. Parmet conducted a differential diagnosis of Mr. Newkirk to conclude

that Mr. Newkirk has bronchiolitis obliterans from exposure to butter flavor in

microwave popcorn vapor. Dr. Parmet admitted that he was unaware of how much

exposure to diacetyl Mr. Newkirk would have had or how much exposure would

rise above a safe level to a dangerous level. Dr. Parmet Dep. Dec. 16, 2009 (Ct.

Rec. 248-8 at 190, 199). However, Dr. Parmet appears to base his conclusion on

an assumption that because microwave popcorn flavor contains diacetyl and

because studies have supported the conclusion that workers' exposure to diacetyl

can cause bronchiolitis obliterans that Mr. Newkirk's exposure to microwave

popcorn caused Mr. Newkirk's bronchiolitis obliterans. Dr. Parmet testified that

his assumption was that a consumer's exposure to microwave popcorn butter

flavor, at any level, was unsafe unless "Defendants can prove otherwise." Dr.

Parmet Dep. Dec. 16, 2009 (Ct. Rec. 248-8 at 211) ("I'm going to make the

assumption that [diacetyl] is the cause until proven otherwise."). This conclusion

MEMORANDUM OPINION AND ORDER ~ 55

is not only scientifically unsound, it is legally unsound in light of the plaintiff's burden to prove causation in a toxic tort case.  *Golden*, 528 F.3d at 683.

Similar to the analysis of Dr. Pue's testimony, Dr. Parmet's testimony on specific causation fails to satisfy Fed. R. Evid. 702 requirements.   First, Dr. Parmet's specific causation testimony resulting from his differential diagnosis relied on Dr. Egilman's general causation testimony that the Court excluded. Without general causation established, Dr. Parmet's specific causation testimony fails.  *See Hall v Baxter Healthcare Corp*., 947 F. Supp. 1387, 1413 (D.Or. 1996). In addition, Dr. Parmet's methodology of concluding that Mr. Newkirk suffered from bronchiolitis obliterans from microwave popcorn vapor exposure without any parameters as to what a safe or unsafe level of exposure would be is not the product of reliable principles and methods based upon sufficient facts or data, as required by Fed. R. Evid. 702.

Therefore, the Court grants Defendants' Motion to Exclude the Specific Causation Testimony of Dr. Parmet.

### *Mr. Ewing*

Defendants move to exclude the testimony of Mr. Ewing, an industrial hygienist, on the grounds that Mr. Ewing failed to support his opinions with scientifically valid and reliable methodology.  Mr. Ewing prepared two reports.  In his first report, dated September 14, 2009, Mr. Ewing states that he based his

MEMORANDUM OPINION AND ORDER ~ 56

opinions on Plaintiffs' responses to interrogatories as well as interviewing Mr.
Newkirk by telephone (Ct. Rec. 248-6 at 158).  As part of his report, Mr. Ewing
included drawings, prepared by Mr. Newkirk, that estimate the locations of
microwave ovens used in his places of employment and home.  Ewing Expert
Report, Sept. 14, 2009 (Ct. Rec. 248-6 at 159-60).  On the drawings, there are
approximate distances noted.  Ewing Expert Report, Sept. 14, 2009 (Ct. Rec. 248-6
at 160).  Mr. Ewing relied on the approximate measurement of the drawings and
data that he has taken from other sources, such as the Aspen Report, the NIOSH
study, and Dr. Rose's statement to the FDA, to conclude that "It is likely that Mr.
Newkirk had peak exposures when opening bags of microwave popcorn similar to
the levels found among QC [quality control] workers"  Ewing Expert Report, Sept.
14, 2009 (Ct. Rec. 248-6 at 166).

    However, as Defendants emphasize, none of the studies on which Mr. Ewing
relies was constructed to measure a consumer's exposure rate to diacetyl from
microwave popcorn vapor.  In addition, some of the studies included 17 varieties
of 8 different brands of microwave popcorn without differentiating which variety
or brand contained specific amounts of diacetyl.  *See* Jacky A. Rosati, Kenneth A.
Krebs, Xiaoyu Liu, *Emissions from Cooking Microwave Popcorn*, 47 Critical
Reviews in Food Science and Nutrition 701 (November 2007) (Ct. Rec. 330-15 at
752).  In addition, Mr. Ewing admits that no studies were ever conducted to

MEMORANDUM OPINION AND ORDER ~ 57

measure the amount of diacetyl in microwave popcorn vapor that was released into Mr. Newkirk's kitchen after popping microwave popcorn.  Ewing Dep., Dec. 18, 2009 (Ct. Rec. 248-17 at 306).

Mr. Ewing conducted his analysis and provided his expert opinions regarding Mr. Newkirk's exposure to diacetyl from Defendants' product without any measurements as to the amount of diacetyl in the vapor of Defendants' product and without exact measurements as to the size of Mr. Newkirk's kitchen, among other pieces of essential data that would support that Mr. Newkirk's opinions are reliable and relevant to this case.  The Court finds that Mr. Newkirk's opinions are not the result of sufficient facts and data or the product of reliable principles and methods as required by Fed. R. Evid. 702.  Therefore, the Court grants Defendants' Motion to Exclude Specific Causation Testimony of Mr. Ewing.

**B.  Motion for Summary Judgment Dismissal of the Newkirks' Claims**

**1.  Legal Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A key purpose of summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265

MEMORANDUM OPINION AND ORDER ~ 58

1

(1986).  Summary judgment is "not a disfavored procedural shortcut," but is

2

instead the "principal tool[ ] by which factually insufficient claims or defenses

3

4

[can] be isolated and prevented from going to trial with the attendant unwarranted

5

consumption of public and private resources."  *Celotex*, 477 U.S. at 327.

6

The moving party bears the initial burden of demonstrating the absence of a

7

8

genuine issue of material fact.  *See Celotex*, 477 U.S. at 323.  The moving party

9

10

must demonstrate to the Court that there is an absence of evidence to support the

11

non-moving party's case.  *See Celotex Corp.*, 477 U.S. at 325.  The burden then

12

shifts to the non-moving party to "set out 'specific facts showing a genuine issue

13

for trial.'"  *Celotex Corp.*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

14

15

A genuine issue of material fact exists if sufficient evidence supports the

16

claimed factual dispute, requiring "a jury or judge to resolve the parties' differing

17

18

versions of the truth at trial."  *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors

19

Ass'n*, 809 F.2d 626, 630 (9th Cir.1987).  At summary judgment, the court draws

20

21

all reasonable inferences in favor of the nonmoving party. If the nonmoving party

22

produces evidence that contradicts evidence produced by the moving party, the

23

24

court must assume the truth of the nonmoving party's evidence with respect to that

25

fact.  *T.W. Elec. Service, Inc.*, 809 F.2d at 631.  The evidence presented by both the

26

moving and non-moving parties must be admissible. Fed. R. Civ. P. 56(e).

27

28

Furthermore, the court will not presume missing facts, and non-specific facts in

MEMORANDUM OPINION AND ORDER ~ 59

affidavits are not sufficient to support or undermine a claim.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

### 2.  Application of the Standard to the Newkirks' Claims

The Newkirks raise the following claims: (1) negligence; (2) strict liability in tort—design defect; (3) failure to warn; (4) loss of consortium and claim for medical expenses.  All of those claims require the Plaintiffs to show causation. (Ct. Rec. 62) (First Amended Complaint).

This Court has jurisdiction pursuant to 28 U.S.C. § 1332. As such, the Court will apply Washington state substantive law. *Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

To succeed in a negligence claim, "a plaintiff must prove four basic elements: (1) the existence of a duty, (2) breach of that duty, (3) resulting injury, and (4) proximate cause." *Degel v. Majestic Mobile Manor, Inc.*, 129 Wn.2d 43, 48, 914 P.2d 728 (1996) (citing *Tincani v. Inland Empire Zoological Soc'y*, 124 Wn.2d 121, 127-28, 875 P.2d 621 (1994)).

The Newkirks' two product liability claims, design defect and failure to warn, also require them to show proximate causation by a preponderance of the evidence to prevail.  RCW 7.72.030(1); *Iwai v. State*, 129 Wn.2d 84, 96, 915 P.2d 1089 (1996); *see also Lockwood v. AC & S, Inc.*, 109 Wn.2d 235, 245, 744 P.2d 605 (1987) ("Generally, under traditional product liability theory, the plaintiff must

MEMORANDUM OPINION AND ORDER ~ 60

establish a reasonable connection between the injury, the product causing the injury, and the manufacturer of that product.").  A product manufacturer is subject to strict liability in tort for a design defect where "a claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed or not reasonably safe because adequate warnings or instructions were not provided."  RCW 7.72.030(1).  As for the Newkirks' failure to warn claim, Washington law has adopted the definition of common law product liability claims of the Restatement (Second) of Torts § 402A (1965), under which a manufacturer may "incur liability for failure to adequately warn of dangerous propensities of a product which it places in the stream of commerce." *Braaten v. Saberhagen Holdings*, 165 Wn.2d 373, 384, 198 P.3d 493 (2008).  The plaintiff must show that the failure to warn of the dangers of a given product proximately caused the plaintiff's injuries.  *Ayers By and Through Ayers v. Johnson & Johnson Baby Products Co.*, 117 Wn.2d 747, 752, 818 P.2d 1337 (Wash. 1991).

The Newkirks' fourth claim, loss of consortium and claim for medical expenses, is an element of damages and thus does not create a material question of fact to survive summary judgment if the other claims are dismissed.  *See Walker v. State*, 60 Wn. App. 624, 630, 806 P.2d 249 (Wash. Ct. App. Div. II 1991).

MEMORANDUM OPINION AND ORDER ~ 61

Therefore, in order to be successful on any of their claims, Plaintiffs must prove by a preponderance of the evidence the following elements of causation: (1) general causation; exposure to microwave popcorn vapors can cause bronchiolitis obliterans and other respiratory ailments as alleged by Mr. Newkirk in the complaint; and (2) specific causation; Mr. Newkirk suffered his alleged injuries as a result of his exposure to microwave popcorn vapor. *See e.g., Henricksen., 605 F. Supp. 2d at 1155 (citing Jaros v. E.I. DuPont (In re Hanford Nuclear Reservation Litig.)*, 292 F.3d 1124, 1133 (9th Cir. 2002)).

In this case, the Court has excluded Plaintiffs' proffered general causation expert witness, Dr. Egilman, as inadmissible. As discussed above, the Court also has excluded Plaintiffs' proffered specific causation expert witnesses: Dr. Egilman, Dr. Pue, Dr. Parmet, and Mr. Ewing. The Court finds that in light of the exclusion of Plaintiffs' evidence, Plaintiffs have failed to provide sufficient admissible evidence to support their burden of proof on any of their claims. Without evidence of causation claims, there is no genuine issue of material fact, and the Defendants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

Therefore, the Court grants Defendants' Motion for Summary Judgment, Ct. Rec. 243. The Court dismisses all of Plaintiffs' claims with prejudice.

MEMORANDUM OPINION AND ORDER ~ 62

# IV.  CONCLUSION

**IT IS HEREBY ORDERED**:

1.  Defendants' Joint Motion to Exclude Supplemental Opinions of Dr. David Egilman, **Ct. Rec. 359**, is **DENIED**.

2.  Defendants' Joint Motion to Exclude the General Causation Testimony of Plaintiffs' Experts, **Ct. Rec. 228**, is **GRANTED**.

3.  Defendant's Joint Motion to Exclude the Specific Causation Testimony of Plaintiffs' Expert Dr. Egilman, **Ct. Rec. 231**, is **GRANTED**.

4.  Defendant's Joint Motion to Exclude the Specific Causation Testimony of Plaintiffs' Expert Dr. Pue, **Ct. Rec. 234**, is **GRANTED**.

5.  Defendant's Joint Motion to Exclude the Specific Causation Testimony of Plaintiffs' Expert Allen J. Parmet, **Ct. Rec. 237**, is **GRANTED**.

6.  Defendant's Joint Motion to Exclude the Specific Causation Testimony of Plaintiffs' Expert William Ewing, **Ct. Rec. 240**, is **GRANTED.**

7.  Defendants' Joint Motion for Summary Judgment Dismissal of Plaintiffs' Claims, **Ct. Rec. 243**, is **GRANTED**.  Plaintiffs' claims are dismissed with prejudice.

MEMORANDUM OPINION AND ORDER ~ 63

8.  All other pending motions on the docket are **DENIED AS MOOT**.

The District Court Executive is directed to enter this memorandum opinion and order, provide copies to counsel, and **close** the file in this case.

**DATED** this 2nd day of July, 2010.


_____*s/ Rosanna Malouf Peterson*_____
ROSANNA MALOUF PETERSON
United States District Court Judge

MEMORANDUM OPINION AND ORDER ~ 64

1

2

| **ADDENDUM A:** Filings Related to the Motions Before the Court | |
|---|---|
| Defendants' Joint Motion to Exclude the General Causation Testimony of Plaintiffs' Experts | Ct. Rec. 228 |
| Memorandum of Authorities in Support of Defendants' Joint Motion to Exclude the General Causation Testimony of Plaintiffs' Expert Witnesses | Ct. Rec. 229 |
| Defendants' Joint Motion to Exclude the Specific Causation Testimony of Plaintiffs' Expert Dr. Egilman | Ct. Rec. 231 |
| Memorandum in Support of Defendants' Joint Motion to Exclude the Specific Causation Testimony of Plaintiffs' Expert Dr. Egilman | Ct. Rec. 232 |
| Defendants' Joint Motion to Exclude the Specific Causation Testimony of Plaintiffs' Expert Dr. Pue | Ct. Rec. 234 |
| Memorandum of Authorities in Support of Defendants' Joint Motion to Exclude the Specific Causation Testimony of Plaintiffs' Expert Dr. Pue | Ct. Rec. 235 |
| Defendants' Joint Motion to Exclude the Testimony of Plaintiffs' Expert Allen J. Parmet | Ct. Rec. 237 |
| Memorandum of Authorities in Support of Defendants' Joint Motion to Exclude Plaintiffs' Expert Allen J. Parmet | Ct. Rec. 238 |
| Defendants' Joint Motion to Exclude the Testimony of Plaintiffs' Expert William Ewing | Ct. Rec. 240 |
| Memorandum of Authorities in Support of Defendants' Joint Motion to Exclude the Testimony of Plaintiffs' Expert William Ewing | Ct. Rec. 241 |
| Declaration of Dr. Kendall Wallace in Support of Defendants' Joint Motions to Exclude Expert Testimony and Dispositive Motions | Ct. Rec. 247 |
| Declaration of Elizabeth J. Citurs in Support of Defendants' Joint Motions to Exclude Expert Testimony and Dispositive Motions (Exhibits 1-21) | Ct. Rec. 248 |
| Additional Attachments to Main Document (248) – Exhibits 1-23 | Ct. Rec. 249 |
| Additional Attachments to Main Document (248) – Exhibits 1-11 | Ct. Rec. 250 |
| Additional Attachments to Main Document (248) – Exhibits 1-29 | Ct. Rec. 251 |
| Errata re Statement of Undisputed Material Facts in Support of Defendants' Joint Motions to Exclude Expert Testimony and Joint Dispositive Motions Pursuant to LR 56.1(a) – with Attachment 1 | Ct. Rec. 283 |
| Errata re Memorandum of Authorities in Support of Defendants' Joint Motion to Exclude the General Causation Testimony of | Ct. Rec. 284 |

MEMORANDUM OPINION AND ORDER ~ 65

| | |
|---|---|
| Plaintiffs' Expert Witness – with Attachment 1 | |
| Errata re Memorandum of Authorities in Support of Defendants' Joint Motion to Exclude the Specific Causation Testimony of Plaintiffs' Expert Dr. Egilman – with Attachment 1 | Ct. Rec. 285 |
| Errata re Memorandum of Authorities in Support of Defendants' Joint Motion to Exclude the Specific Causation Testimony of Plaintiffs' Expert Dr. Pue – with Attachment 1 | Ct. Rec. 286 |
| Errata re Memorandum of Authorities in Support of Defendants' Joint Motion for Summary Judgment – with Attachment 1 | Ct. Rec. 287 |
| Plaintiffs' Opposition to Defendants' Joint Motion for Summary Judgment and Daubert Motions (Ct. Doc. 228, 231, 234, 237, 240, and 243) – with Appendix 1 | Ct. Rec. 320 |
| Plaintiffs' Counter Statement of Material Facts in Support of Plaintiffs' Opposition to Defendants' Joint Motion for Summary Judgment and Daubert Motions | Ct. Rec. 321 |
| Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts in Support of Defendants' Joint Motion to Exclude Testimony and Joint Dispositive Motions Pursuant to LR 56.1(a)(Doc. 246) | Ct. Rec. 322 |
| Affidavit of Dr. David Egilman in Support of Plaintiffs' Opposition to Joint Motion for Summary Judgment and Joint Daubert Motions – Exhibits 1 and 2 | Ct. Rec. 323 |
| Supplemental Affidavit of Dr. David Egilman in Support of Plaintiffs' Opposition to Joint Motion for Summary Judgment and Joint Daubert Motions – Exhibit 1 | Ct. Rec. 325 |
| Declaration of Christopher R. Miller in Support of Plaintiffs' Opposition to Defendants' Joint Motion for Summary Judgment and Daubert Motions (Ct. Docs. 228, 231, 234, 237, 240, and 243) – Exhibits 1-26 | Ct. Rec. 327 |
| Additional Attachments to Main Document (327) – Exhibits 1 -11 (Ct. Rec. 328) | Ct. Rec. 328 |
| Additional Attachments to Main Document (327) – Exhibits MM-SS | Ct. Rec. 329 |
| Additional Attachments to Main Document (327) – Exhibits TT-ZZ | Ct. Rec. 330 |
| Additional Attachments to Main Document (327) – Exhibits AAA-III | Ct. Rec. 331 |
| Additional Attachments to Main Document (327) – Exhibits JJJ-PPP | Ct. Rec. 332 |
| Additional Attachments to Main Document (327) – Exhibits QQQ- | Ct. Rec. 333 |

MEMORANDUM OPINION AND ORDER ~ 66

| XXX | |
|---|---|
| Additional Attachments to Main Document (327) – Exhibits AAAA-JJJJ | Ct. Rec. 334 |
| Sealed Documents – Exhibits II, WW, LLL, RRR, SSS | Ct. Rec. 335 |
| Defendants' Joint Motion to Exclude the Supplemental Opinions of Dr. David Egilman | Ct. Rec. 359 |
| Memorandum of Authorities in Support of Defendants' Joint Motion to Exlude the Supplemental Opinions of Dr. David Egilman | Ct. Rec.360 |
| Declaration of Elizabeth J. Citurs in Support of Defendants' Joint Motion to Exclude the Supplemental Opinions of Dr. David Egilman – Exhibits A pgs 5-122 | Ct. Rec. 361 |
| Reply Memorandum of Authorities in Support of Defendants' Joint Motion to Exclude the General Causation Testimony of Plaintiffs' Expert Witnesses | Ct. Rec. 388 |
| Reply Memorandum in Support of Defendants' Motion to Exclude Plaintiffs; Expert William Ewing | Ct. Rec. 389 |
| Reply Memorandum in Support of Defendants' Joint Motion to Exclude the Specific Causation Testimony of Dr. Pue | Ct. Rec. 390 |
| Reply Memorandum in Support of Defendants' Joint Motion to Exclude Plaintiffs' Expert Allen J. Parmet | Ct. Rec. 391 |
| Reply Memorandum in Support of Defendants' Joint Motion to Exclude the Specific Causation Testimony of Dr. Egilman | Ct. Rec. 392 |
| Affidavit of Dr. John Morris in Support of Defendants' Joint Motions to Exclude Expert Testimony and Dispositive Motions | Ct. Rec. 393 |
| Declaration of Micah Hines in Support of Defendants' Joint Motions to Exclude Expert Testimony and Dispositive Motions – Exhibits A-F | Ct. Rec. 394 |
| Reply Memorandum in Support of Defendants' Joint Motion for Summary Judgment | Ct. Rec. 459 |
| Plaintiffs' Response to Defendants' Joint Motion to Exclude the Supplement Opinions of Dr. David Egilman – Appendix A | Ct. Rec. 476 |
| Declaration of Christopher R. Miller in Support of Plaintiffs' Response to Defendants' Joint Motion to Exclude the Supplemental Opinions of Dr. David Egilman – Exhibits A-W | Ct. Rec. 477 |
| Additional Attachments to Document 477 – Exhibits BB-EE | Ct. Rec. 478 |
| Reply Memorandum in Support of Defendants' Joint Motion to Strike the Supplemental Opinions of Dr. David Egilman | Ct. Rec. 508 |
| Declaration of Corey L. Gordon in Support of Defendants' Joint Motions to Exclude the Supplemental Opinions of Dr. David | Ct. Rec. 509 |

MEMORANDUM OPINION AND ORDER ~ 67

| | |
|---|---|
| Egilman – Exhibits A-T | |
| Declaration of Wayne Waite in Support of Defendants' Joint Motion to Exclude the Supplemental Opinions of Dr. David Egilman | Ct. Rec. 510 |

MEMORANDUM OPINION AND ORDER ~ 68

**ADDENDUM B:** Additional conclusions and 0pinions of Dr. Egilman offered without documentation

a. Dr. Egilman analogizes diacetyl to asbestos and states that "physicians and courts agree that it is not necessary to know or even estimate exposure levels to determine that asbestos caused or contributed to a mesothelioma" (Ct. Rec. 323 at 33).

b. "This outbreak was preventable. The diacetyl manufacturing companies should have tested their products for safety prior to sale" (Ct. Rec. 248-2 at 51).

c. "Opinion: The Popcorn Board actively sought to mislead the public about the about [sic] potential negative health outcomes related to popping microwave popcorn" (Ct. Rec. 248-2 at 57).

d. "Opinion: Mr. Newkirk did not receive adequate warnings about the risk of development of irreversible obstructive lung damage attributable to diacetyl inhalation. In addition the Popcorn Board placed anti-warnings on their web site and in communications to the public." (Ct. Rec. 248-2 at 57).

e. "There were no epidemiologic studies done to show that insulin was related to diabetes." (Ct. Rec. 323 at 49)

f. "The "poor ventilation" was noted to explain the nature of the exposures to vapor released from popped bags by NIOSH (HHEs ["Health Hazard Evaluations"]). Exposure to slurry vapor would depend on whether or not the QC room was under negative pressure. There is no evidence this was the case at Jasper; thus, there is no evidence of exposure to slurry vapors in the QC room. This is speculation." (Ct. Rec. 323 at 19-20).

g. "Popcorn manufacturing companies should have and should warn that other chemicals used in microwave popcorn packaging (Heat resistant bags and adhesive) may put consumers at increased risk for cancer" (Id. at 27).

h. "Opinion: Like the Popcorn Board, ConAgra actively sought to mislead the public about the about [sic] potential negative health outcomes related to popping microwave popcorn." (Ct. Rec. 248-2 at 41).

i. "ConAgra claimed to go 'diacetyl-free' around the same time that the first consumer case of BO was diagnosed. Consumers were informed that they were 'not at risk' and implied that Mr. Watson's exposures were 'extreme' because he inhaled the flavors" (Ct. Rec. 248-2 at 41).

j. "Chris Hansen failed to adequately warn about the risks of diacetyl exposure from use of its diacetyl containing products to workers and consumers." Ct. Rec. 248-2 at 42).

k. "Since ConAgra did not preserve samples of ACT II popcorn with diacetyl

MEMORANDUM OPINION AND ORDER ~ 69

neither the slurry nor the MWPC to which Mr. Newkirk was exposed can be tested" (Ct. Rec. 323 at 58).[8]

l. Dr. Egilman recites that the "Popcorn Board" created a "tip sheet" for safety procedures, but then did not distribute the tip sheet (Ct. Rec. 248-2 at 55). Dr. Egilman then concludes, "This was a bad thing to do" (Ct. Rec. 248-2 at 55).

m. "Opinion:  The Popcorn Board expressed that they had a duty to warn.  I agree.  They did not warn.  This is bad."  (Ct. Rec. 248-2 at 31).

n. "Because it is agreed that exposure to diacetyl is necessary and sufficient condition for butter flavoring to cause disease, and because there is no accepted (or even publically theorized "safe level of exposure"), ConAgra and other popcorn manufacturing companies have stopped adding diacetyl to their commercial popcorn products. ConAgra's news release on December 17, 2007 [sic] introduced Orville Redenbacher and ACT II microwave popcorn brands "with a New Great Tasting Butter Flavoring with No Added Diacetyl": "to eliminate even the perception of risk for consumers, and to provide the safest possible environment for workers who handle large

---

[8] Evidence in the record directly refutes Dr. Egilman's claim.  Declaration of Corey Gordon in Support of Defendants' Joint Motion to Exclude the Supplemental Opinions of Dr. Egilman (Ct. Rec. 509 at 16-19) (Asserting that "ConAgra actually did maintain samples of microwave product with added diacetyl, a fact known to plaintiffs since December 29, 2008, when ConAgra so advised plaintiffs in discovery that it had examples it would make available to plaintiffs" but simultaneously noting that the samples may be problematic for testing due to lack of freshness); (Tr. from 6/7/2010 at 135-36) (ConAgra's counsel explained that his client has preserved samples but that he "just didn't turn them over to [Plaintiffs's counsel] without them telling me what they're going to do with them.").

MEMORANDUM OPINION AND ORDER ~ 70

quantities of diacetyl, the company has decided to eliminate the use of added diacetyl in its microwave popcorn products."  (Ct. Rec. 323 at 37-38).

o.  In analogizing diacetyl exposure to tobacco, Dr. Egilman makes statements like, " . . . all physicians agree that these and in fact, all cigarettes that emit tobacco smoke cause cancer" (Ct. Rec. 323 at 35) (citing nothing).

p.  Dr. Egilman uses a variety of assumptions to calculate TWA exposures, without providing any basis for his assumptions.  (Ct. Rec. 323 at 26-27) For example, in his rebuttal of the Lockey Study, Dr. Egilman states "If we divide 800 ppb [parts per billion] by 9.2 to reduce the exposure and divide again by 45 (an approximate lifetime worker exposure), a worker exposed to greater than 1.9 ppb TWA over 45 years would have an increased risk of obstruction" (Ct. Rec. 323 at 26-27) (citing nothing).

q.  Dr. Egilman relies on the 2004 identification of three cases of bronchiolitis obliterans among process operators in a diacetyl plant owned by Dutch company DSM yet cites no study or article supporting these diagnoses  (Ct. Rec. 248-2, Egilman 9/15/09 report at 18).

r.  Dr. Egilman argues that there is no necessity in identifying the exact chemical(s) in a mixture that are responsible for disease causation.  (Ct. Rec. 323 at 7 n 3).